1 │ TERRY L. BAKER (SBN 214365)
   │ 820 Bay Avenue, Suite 230L
2 │ Capitola, CA 95010
   │ Tel:   (831) 476-7900
3 │ Fax:   (831) 476-7906
   │ tbaker@consumerlawgroup.net
4 │
   │ Attorney for Plaintiffs
5 │ LAWRENCE BROOKS, DARLENE LEONG
   │ and LRB'S DIRECT, LLC
6 │
7 │

ORIGINAL FILED

JUL 17 2013

Richard W. Wieking
Clerk, U.S. District Court
Northern District of California
San Jose

8 │
9 │                    **UNITED STATES DISTRICT COURT**
10 │                 **NORTHERN DISTRICT OF CALIFORNIA**
11 │                          **SAN JOSE DIVISION**
12 │ LAWRENCE BROOKS and DARLENE        Case No.  CV13-03325 PSG
    │ LEONG, individually and as trustees of
13 │ The 2003 Brooks/Leong Trust; and    **COMPLAINT**
    │ LRB'S DIRECT, LLC, a limited liability
14 │ company,                            **DEMAND FOR JURY TRIAL**
15 │            Plaintiffs,
16 │ vs.
17 │ BAY AREA EQUITY GROUP, LLC, a
    │ limited liability company; ANTRANIK
18 │ KABAJOUZIAN, an individual;
    │ TERRANCE BROWN, an individual;
19 │ LISA NAVA, an individual; ADRIENNE
    │ ROCHE, an individual; and DEREK
20 │ SCHNEIDER, an individual,
21 │            Defendants.
    │ ─────────────────────────────────
22 │                          <u>JURISDICTION</u>
23 │      **1.**    The court has federal question jurisdiction under 18 U.S.C. § 1965 and Title
24 │ 28 U.S.C. § 1331, as well as supplemental jurisdiction over plaintiffs' state law claims
25 │ under Title 28 U.S.C. § 1367. The amount in controversy exceeds $75,000.00 for
26 │ plaintiffs, exclusive of costs and interest.
27 │
28 │

<div align="center">

**PARTIES**

</div>

2.      Plaintiff Lawrence R. Brooks (hereinafter "BROOKS"), at all times mentioned, was, and still is, a resident of the city of San Jose,, Santa Clara County, California.  BROOKS is also trustee of The 2003 Brooks/Leong Family Trust (hereinafter the "TRUST").  At all relevant times herein, BROOKS also acted as an agent of LRB's Direct, LLC.

3.      Plaintiff Darlene Leong (hereinafter "LEONG"), at all times mentioned, was, and still is, a resident of the city of San Jose, Santa Clara County, California.  LEONG is also trustee of the TRUST.

4.      Plaintiff LRB's Direct, LLC (hereinafter "LRB") is a duly authorized Nevada limited liability company.

5.      For brevity, BROOKS, LEONG, and LRB will be collectively referred to as "Plaintiffs" at appropriate times.

6.      Defendant Bay Area Equity Group, LLC (hereinafter "BAEG"), is a California limited liability company with its principal place of business located at 1901 S. Bascom Avenue, Suite 1325, Campbell, California 95008.

7.      Defendant Antranik Kabajouzian a.k.a Anto Kabajouzian (hereinafter "KABAJOUZIAN") is an individual over the age of eighteen and is an officer, director, owner, member, manager, and employee of BAEG.  Plaintiff alleges that BAEG is the alter ego of KABAJOUZIAN, and that there is insufficient separation of identity between KABAJOUZIAN and the entity such that injustice would result to plaintiff in this matter if the corporate veil were to remain intact.

8.      Defendant Terrance Brown (hereinafter "BROWN") is an individual over the age of eighteen and was, at all times relevant herein, an employee, officer, and agent of BAEG.  Plaintiff alleges that BAEG is the alter ego of BROWN, and that there is insufficient separation of identity between BROWN and the entity such that injustice would result to plaintiff in this matter if the corporate veil were to remain intact.

9.      Defendant Lisa Nava (hereinafter "NAVA") is an individual over the age of

1 eighteen and was, at all times relevant herein, an employee and agent of BAEG and

2 KABAJOUZIAN and BROWN.

3      **10.**     Defendant Adrienne Roche (hereinafter "ROCHE") is an individual over

4 the age of eighteen and was, at all times relevant herein, an employee and agent of BAEG

5 and KABAJOUZIAN and BROWN.

6      **11.**     Defendant Derek Schneider (hereinafter "SCHNEIDER") is an individual

7 over the age of eighteen and was, at all times relevant herein, an employee and agent of

8 BAEG and KABAJOUZIAN and BROWN.

9      **12.**     All acts of the agents, servants and employees of defendant BAEG, as

10 alleged in this complaint, were performed by such agents, servants and employees within

11 the course and scope of their agency and employment with BAEG and were authorized

12 and/or ratified by BAEG.

13                    <u>FACTS COMMON TO ALL COUNTS</u>

14      **13.**     On March 16, 2011, BROOKS attended a Chamber of Commerce luncheon

15 at Buca Di Beppo in Campbell, California sponsored, in part, by BAEG.  During the

16 luncheon, defendant SCHNEIDER made a presentation on behalf of BAEG about

17 investment opportunities that were available through BAEG.

18      **14.**     BROOKS was interested in the information presented by SCHNEIDER and

19 arranged for a meeting with SCHNEIDER at BAEG's offices in Campbell, California on

20 April 6, 2011.

21      **15.**     During the meeting, SCHNEIDER presented BROOKS with written

22 literature regarding BAEG's services.  In addition to the written materials, SCHNEIDER

23 verbally represented to BROOKS that they offered "turn-key investments in rental

24 properties with guaranteed rents."

25      **16.**     On April 15, 2011, BROOKS met with KABAJOUZIAN at BAEG's office

26 in Campbell.  During the meeting, KABAJOUZIAN represented to BROOKS and

27 LEONG that BAEG had "fully refurbished" rental properties in Detroit, Michigan.

28 KABAJOUZIAN represented that all of the houses in BAEG's inventory had been

1   "thoroughly researched, refurbished, and currently had rent-paying tenants."

2   KABAJOUZIAN specifically represented that all of the available investment properties

3   had a new roof, new plumbing, new electrical wiring, new flooring, new windows, and

4   new appliances.

5        **17.**   KABAJOUZIAN represented that BAEG's rental properties would provide

6   BROOKS and LEONG with at least a 15% return on investment (hereinafter "ROI").

7        **18.**   KABAJOUZIAN further stated that along with the properties purchased,

8   BAEG offered a rental protection plan, at no charge, for the first twelve months of

9   ownership.  The rental protection plan guaranteed that if, for some reason, BAEG was

10   unable to collect rent from a tenant, BAEG would cover the rent guaranteeing that

11   BROOKS and LEONG would maintain their advertised ROI of 15%.

12        **19.**   KABAJOUZIAN further represented that along with each property

13   purchased, BAEG provided a home warranty, at no charge, for the first twelve months of

14   ownership.  The home warranty would ensure that if any property needed maintenance or

15   repair, the warranty would cover the cost again ensuring that BROOKS and LEONG

16   would maintain the advertised ROI of 15%.

17        **20.**   KABAJOUZIAN represented that after the first twelve months of

18   ownership, BROOKS and LEONG could continue the rental protection plan at a cost of

19   10% of the rent collected from the property.

20        **21.**   KABAJOUZIAN represented that BAEG managed each property "in-

21   house." BAEG would do the legwork collecting the rents for BROOKS and LEONG and

22   forward the money onto BROOKS and LEONG.  Essentially, all BROOKS and LEONG

23   had to do was sign on the bottom line and watch their investment money grow.

24        **22.**   The above verbal representations were and are also in written form both on

25   paper and on BAEG's website bayareaequitygroup.com. The website boasts

26   "GUARANTEED RENTS" and includes abbreviated testimonials from purported

27   satisfied investors.  The website includes the following representation: "Having that

28   sound piece of mind is the cornerstone of our business, and to back that statement up, Bay

1  Area Group is proud to include a Rental Income Protection Plan with every investment
2  property sold to our clients.  While the concept may seem complicated or strange at first,
3  the practice is not.  On any given month, if a tenant at your purchased property does not
4  pay rent for any reason, Bay Area Equity Group will pay the rent on their behalf!"

5      **23.**  Based upon the advertisements and representations made by
6  KABAJOUZIAN, on behalf of BAEG, BROOKS and LEONG agreed to invest in the
7  properties and purchase the services being offered by BAEG.

8      **24.**  On April 15, 2011, BROOKS and LEONG, as trustees, agreed to purchase
9  two investment properties from BAEG and KABAJOUZIAN, to be held in the TRUST -
10  10137 McKinney (hereinafter "McKinney Property") and 10960 Rossiter Street
11  (hereinafter "Rossiter Property").  BROOKS and LEONG agreed to pay $27,995.00 for
12  the McKinney Property and $25,995.00 for the Rossiter Property.  Again, BAEG and
13  KABAJOUZIAN represented that both properties had been refurbished and had current
14  rent-paying tenants.

15      **25.**  On April 15, 2011, ROCHE emailed BROOKS, with a courtesy copy sent
16  to BAEG and SCHNEIDER, copies of purchase agreements for the McKinney Property
17  and the Rossiter Property.  BROOKS promptly signed the agreements and returned them
18  to ROCHE at BAEG.  A true and correct copy of the purchase agreement for the
19  McKinney Property is attached hereto as Exhibit A.

20      **26.**  On April 19, 2011, ROCHE sent BROOKS an email acknowledging receipt
21  of the purchase agreements.  ROCHE then informed BROOKS that the Rossiter Property
22  was not available and that they would like to offer a substitute property - 15853 East State
23  Fair (hereinafter "ESF Property").  ROCHE boasted that BROOKS was getting a better
24  deal with the ESF property as the ROI would be 18%.  BROOKS signed the purchase
25  agreement for the ESF Property and returned it to ROCHE.  A true and correct copy of
26  the purchase agreement for the ESF Property is attached hereto as Exhibit B.

27      **27.**  For a short period of time, BROOKS' and LEONG's two investment
28  properties seemed to be doing well as they were paid rents in a timely fashion.

28.     On or about August 11, 2011, BROOKS and LEONG decided to purchase another property from BAEG under the same program as the McKinney and ESF Properties.  BROOKS and LEONG agreed to pay $28,595.00 for a property located at 4685 Newport Street in Detroit (hereinafter "Newport Property 1").  As with the prior properties, BAEG was to manage the Newport Property and collect the rents on behalf of BROOKS and LEONG and the property was to be held in the TRUST.  A true and correct copy of the purchase agreement for the Newport Property is attached hereto as Exhibit C.

29.     On or about November 01, 2011, BROOKS and LEONG signed a purchase agreement to purchase another property located at 1318 Alter Street in Detroit (hereinafter "Alter Property 1").  As with the prior properties, BAEG was to manage the Alter Property 1 and collect the rents on behalf of BROOKS and LEONG and the property was to be held in the TRUST.  A true and correct copy of the purchase agreement for the Newport Property is attached hereto as Exhibit D.

30.     In November of 2012, BROOKS was working with KABAJOUZIAN on the design for a new BAEG Mobile Website.  During their discussions, KABAJOUZIAN educated BROOKS on BAEG's Bay Area Self Direct program and sold the concept to BROOKS as a way to invest in additional properties tax free.  KABAJOUZIAN proposed that BROOKS take funds out of his traditional IRA and place them into a self-directed IRA ("SDIRA") which would allow him to use the funds to purchase additional rental properties through BAEG.  KABAJOUZIAN stated that he would handle every aspect of setting up the SDIRA, an LLC, and a trust at no cost to BROOKS.  KABAJOUZIAN provided BROOKS with the forms and instructed BROOKS how to prepare them.  BROOKS followed KABAJOUZIAN's instructions as to how to open the account online through a company called My Self Direct, a trademark/subsidiary of Provident Trust Group.  Additionally, KABAJOUZIAN opened a Wells Fargo Bank account for BROOKS.

31.     After setting up the SDIRA, BROOKS funded the account on or about January 24, 2012 with $220,000.00.  My Self Direct created LRB for BROOKS and on

1  January 25, 2012, BROOKS' SDIRA made a capital contribution to LRB in the amount

2  of $219,255.00.  On the same day, LRB purchased four rental properties from BAEG.

3       **32.**     LRB purchased 1605-07 Alter Street (hereinafter "Alter Property 2) for a

4  price of $53,895.00.  As with the prior properties, BAEG was to manage the Alter

5  Property 2 and collect the rents.  Unlike the rents for Alter Property 1, the rents for Alter

6  Property 2 were to be directly deposited by BAEG into the SDIRA.  A true and correct

7  copy of the purchase agreement for the Alter Property 2 is attached hereto as Exhibit E.

8       **33.**     LRB purchased 2167-69 Alter Street (hereinafter "Alter Property 3) for a

9  price of $64,995.00.  As with the prior properties, BAEG was to manage the Alter

10  Property 3 and collect the rents.  Unlike the rents for the properties held in TRUST, the

11  rents for Alter Property 3 were to be directly deposited by BAEG into the SDIRA.  A true

12  and correct copy of the purchase agreement for the Alter Property 3 is attached hereto as

13  Exhibit F.

14       **34.**     LRB purchased 219 Newport Street (hereinafter "Newport Property 2) for a

15  price of $54,995.00.  As with the prior properties, BAEG was to manage the Newport

16  Property 2 and collect the rents.  Unlike the rents for the properties held in TRUST, the

17  rents for Newport Property 2 were to be directly deposited by BAEG into the SDIRA.  A

18  true and correct copy of the purchase agreement for the Newport Property 2 is attached

19  hereto as Exhibit G.

20       **35.**     Lastly, LRB purchased 22773 N. Kane (hereinafter "Kane Property) for a

21  price of $38,495.00.  As with the prior properties, BAEG was to manage the Kane and

22  collect the rents.  Unlike the rents for the properties held in TRUST, the rents for the

23  Kane Property were to be directly deposited by BAEG into the SDIRA.  A true and

24  correct copy of the purchase agreement for the Kane Property  is attached hereto as

25  Exhibit H.

26       **36.**     All of the properties owned by LRB in the SDIRA also came with the rental

27  protection plan and home warranty, as well as the promise that BAEG managed the

28  property directly and would collect all rents and deposit them into the SDIRA.

1   37.     With respect to each TRUST and LRB property, plaintiffs opted to renew
2   both the rental protection plan and the home warranty plan upon the 12th month of
3   ownership of each property for a fee of 10% of the rent.

4   38.     On or about February 2012, BAEG failed to make the required deposits into
5   the SDIRA and the TRUST account. From February 2012 through the present, BAEG
6   has failed to pay plaintiffs all the total guaranteed rents they are owed.

7   39.     On or about May 2012, plaintiffs learned that BAEG was not "managing
8   the properties in-house." The properties were being managed by third-party(s)
9   management company that plaintiffs knew nothing about.

10   40.     Defendants have failed and refused to make timely "guaranteed" payments
11   on the TRUST and LRB properties. To date, the amount of unpaid rents on the TRUST
12   properties is $15,155.00. To date, the amount of unpaid rents on the LRB properties is
13   $30,600.00.

14   41.     In May of 2013, plaintiffs learned that the McKinney property had been
15   vandalized and numerous fixtures and appliances were broken or stolen. Plaintiffs
16   learned that Newport Property 1 had been vandalized and was vacant. In essence, despite
17   being told that BAEG was managing the properties, they were not. Alternatively, to
18   avoid the cost of repairing the vandalized homes pursuant to the terms of the home
19   warranty, defendants failed to inform plaintiffs that the homes had been vandalized.

20   42.     Plaintiffs have been contacting defendants since February 2012 about the
21   late and unpaid rental payments, the condition of the properties, the status of tenancy, and
22   the reasons why the payments are not being made.

23   43.     All defendants have participated in some manner or other in relaying false
24   promises, excuses, or other delay tactics to stall plaintiffs from taking action.

25   44.     Plaintiffs are informed and believe that defendants have collected a majority
26   of rents from plaintiffs' properties, but have either converted the money to their own use,
27   or have used plaintiffs' funds to pay other investors.

28   45.     In addition to the aforementioned facts, in 2012, plaintiffs became aware

1  that some of the properties had overdue property taxes that had not been paid prior to
2  plaintiffs obtaining title to the properties.  This very material fact was concealed from
3  plaintiffs.  BROOKS contacted KABAJOUZIAN and then BROWN after being informed
4  that BROWN was now their Premier Client Relationship Manager.  BROWN said that
5  BAEG was "sorry" for the oversight and BAEG would work with the taxing authorities to
6  get the situation straightened out and the taxes paid.  BROWN lied to plaintiff.  In the
7  end, plaintiffs had to collect all the relevant information and pay the taxes.

8  46.  On May 22, 2013, BAEG sent BROOKS a letter terminating the plaintiffs
9  as clients.  The letter stated that the property management services, the rental protection
10  plan, and the home warranty services were over with.  The letter referred plaintiffs to a
11  third-party property management company and informed plaintiffs that they were now
12  own their own.

13  47.  Plaintiffs allege that defendants are involved in a ponzi scheme wherein
14  investors are guaranteed unusually high returns and the fraudsters use the investors' own
15  money to repay them or they use other new investors' money to pay other investors whose
16  returns are due.

17  48.  As of the filing of this action, plaintiffs are owed substantial sums of money
18  by defendants, and have suffered significant damages due to defendants' acts and
19  omissions.

20  **FIRST CLAIM FOR RELIEF**
**Violation of the Consumers Legal Remedies Act**
21  **(By BROOKS and LEONG and Against SCHNEIDER, BAEG, KABAJOUZIAN and BROWN)**

22
23  49.  BROOKS and LEONG incorporate paragraphs 1 through 46 as fully set
forth herein.
24
25  50.  BROOKS and LEONG have been damaged as a result of the actions of
SCHNEIDER, BAEG, BROWN and KABAJOUZIAN.
26
27  51.  BROOKS and LEONG purchased managerial, custodial, and financial
services from SCHNEIDER, BAEG, KABAJOUZIAN and BROWN.
28
52.  The services purchased by BROOKS and LEONG constitute "services"

1  sold to BROOKS and LEONG primarily for personal, family or household purposes

2  pursuant to Civil Code § 1761(b).

3        **53.**    BROOKS and LEONG are "consumers" as defined by Civil Code §

4  1761(d).

5        **54.**    The advertisement, sale, and performance of the services to BROOKS and

6  LEONG is a "transaction" pursuant to Civil Code § 1761(e).

7        **55.**    Additionally, the conduct of SCHNEIDER, BAEG, BROWN and

8  KABAJOUZIAN subsequent to BROOKS' and LEONG'S purchase of services

9  constitute an ongoing "transaction" in that their performance of their obligations is

10  encompassed in the definition of "transaction" found in Civil Code § 1761(e).

11        **56.**    In advertising, selling and performing the services to BROOKS and

12  LEONG, SCHNEIDER, BAEG, KABAJOUZIAN and BROWN made numerous

13  representations of fact that were false.  In carrying out their obligations, SCHNEIDER,

14  BAEG, BROWN and KABAJOUZIAN continued to make false representations of fact in

15  an attempt to appease BROOKS and LEONG and delay them from taking action.

16  SCHNEIDER, BAEG, BROWN and KABAJOUZIAN, by and through miscellaneous

17  employees and agents, continuously made excuses and false promises to BROOKS and

18  LEONG to continue the fraudulent scheme and enterprise invented by SCHNEIDER,

19  BAEG, BROWN and KABAJOUZIAN all at great loss to BROOKS and LEONG and to

20  great profit to SCHNEIDER, BAEG, BROWN and KABAJOUZIAN.

21        **57.**    SCHNEIDER, BAEG, BROWN and KABAJOUZIAN violated §§

22  1770(a)(1)(2)(3)(5)(7)(9)(10)(14) and (16) of the California Civil Code as follows: 1)

23  passed off services as those of another; 2) misrepresented the rights and remedies that

24  BROOKS' and LEONG'S transaction involved, as well as their obligations; 3)

25  misrepresented the source, sponsorship, and approval of services; 4) misrepresented the

26  affiliation, connection or association with another; 5) represented that the services had

27  uses and benefits which they do not have; 6) advertised services with intent not to sell

28  them as advertised; 7) advertised services with intent not to supply reasonably expected

1  demand; 8) represented that the subject of a transaction has been supplied in accordance

2  with a previous representation; and 9) represented that the services were of a particular

3  quality when they were of another.

4      **58.**    Section 1780(a)(2) provides that a consumer is entitled to an injunction

5  prohibiting acts or practices which violate the Act.  BROOKS and LEONG seek an order

6  enjoining SCHNEIDER, BAEG, BROWN and KABAJOUZIAN from the acts, methods

7  and practices as set forth in this Complaint and for payment of restitution.

8      **59.**    On July 10, 2013, pursuant to Civil Code § 1782(a), BROOKS and

9  LEONG, by and through counsel, sent SCHNEIDER, BAEG, BROWN and

10  KABAJOUZIAN notice and demand for rectification by certified mail.  Should

11  SCHNEIDER, BAEG, BROWN and KABAJOUZIAN fail to rectify its violations of the

12  Consumers Legal Remedies Act, BROOKS and LEONG will amend this Complaint,

13  without leave of court, to include a claim for damages pursuant to Civil Code §

14  1780(a)(1) and Civil Code § 1782(d) .

15      **60.**    BROOKS and LEONG allege that the conduct of SCHNEIDER, BAEG,

16  BROWN and KABAJOUZIAN was willful and intentional.  The directors, officers, and

17  managing agents of SCHNEIDER, BAEG, BROWN and KABAJOUZIAN authorized the

18  fraudulent conduct of its employees before the fact and ratified the conduct after the fact

19  by accepting the benefits of the transaction and failing to discharge or discipline

20  responsible employees.

21      **61.**    SCHNEIDER, BAEG, BROWN and KABAJOUZIAN acted with malice,

22  oppression, and fraud by intentionally converting BROOKS' and LEONG's money to

23  their own use.  SCHNEIDER, BAEG, BROWN and KABAJOUZIAN's conduct is

24  despicable.

25            **SECOND CLAIM FOR RELIEF**
               **Fraud/Deceit**

26  **(By All Plaintiffs and Against SCHNEIDER, BAEG, BROWN and**
               **KABAJOUZIAN)**

27      **62.**    Plaintiff incorporates all other paragraphs as fully set forth herein.

28      **63.**    At the time of plaintiffs' purchase of the properties at issue and the

1 aforementioned services, as well as before and afterwards, defendants made the

2 misrepresentations as set forth above.  As detailed above, defendants represented to

3 plaintiffs that they would receive guaranteed rent payments on the properties for twelve

4 months and had the option to extend that guarantee, that the properties were fully

5 researched and refurbished, that the properties were all in good rentable condition and

6 would remain that way, that each property was covered by a no-cost home warranty to

7 cover the cost of any necessary maintenance or repairs, that each house already had

8 renters bound by lease agreements, that defendants managed the properties in-house, and

9 that defendants would collect the rents and deposit the funds into plaintiffs' accounts.

10   **64.**   At the time plaintiffs entered into the transaction(s) with defendants,

11 defendants had no intention of making timely and consistent rent payments to plaintiffs,

12 did not manage the properties, had no intention of maintaining the properties, and had no

13 intention to ensure that each property remained rented.  Plaintiffs are informed and

14 believe that defendants had contracted a third-party property management company

15 without informing plaintiffs.

16   **65.**   Defendants concealed from plaintiffs that they were not going to continue

17 to make rental payments to plaintiffs by providing false promises and excuses for failing

18 to make timely payments.  Rather, defendants intended to use and have used the rent

19 money to perpetuate their ponzi scheme.

20   **66.**   At all times defendants either had actual or constructive notice of the true

21 facts, but nonetheless intentionally or recklessly concealed these facts from plaintiffs.

22   **67.**   Defendants made these representations and omitted material facts with the

23 intent to defraud plaintiffs, to induce plaintiffs to purchase the properties and services.  At

24 the time plaintiffs purchased the properties and services, they did not know, or have

25 reason to know, that defendants were making false and misleading representations and

26 had omitted material facts.  Plaintiffs acted in justifiable reliance upon the truth of the

27 representations which misled them as to the nature and extent of the facts concealed.

28 Plaintiffs were justified in their reliance, as defendants held themselves out as successful,

1    trained professionals in the rental property industry, and plaintiffs had no reason to doubt
2    such representations.

3        **68.**    As a direct and proximate result of defendants' fraudulent representations
4    and omissions of material facts, plaintiffs suffered damages, including actual, general,
5    consequential and incidental in an amount to be proven at trial.

6        **69.**    In making the representations and concealing material facts from plaintiffs,
7    defendants acted intentionally and/or with reckless disregard and acted with malice and
8    oppression justifying an award of punitive damages.

9                          **THIRD CLAIM FOR RELIEF**
                          **Negligent Misrepresentation**
10   **(By All Plaintiffs and Against SCHNEIDER, BAEG, BROWN and**
                              **KABAJOUZIAN)**
11
         **70.**    Plaintiffs incorporates all other paragraphs as fully set forth herein.
12
         **71.**    As an alternative to plaintiffs' claim for relief for fraud/deceit, plaintiffs
13
     alleges that defendants' misrepresentations were made negligently, if not intentionally.
14
         **72.**    The representations made by defendants were not true.
15
         **73.**    Regardless of their actual belief, defendants made the representations
16
     without any reasonable grounds for believing them to be true.
17
         **74.**    Defendants failed to exercise due care in ascertaining the accuracy of the
18
     representations made to plaintiffs.
19
         **75.**    Defendants made the representations for the purpose of inducing plaintiffs
20
     to rely upon them, and to act or refrain from acting in reliance thereon.
21
         **76.**    Plaintiffs were unaware of the falsity of the representations and acted in
22
     reliance upon the truth of those representations, and were justified in relying upon those
23
     representations.
24
         **77.**    As a direct and proximate result of defendants' negligent misrepresentations
25
     of material fact, plaintiffs suffered damages, including actual, consequential, and
26
     incidental in an amount to be proven at trial.
27

28

# FOURTH CLAIM FOR RELIEF
### Violations of Business & Professions Code §§ 17200 *et seq.*
### (By All Plaintiffs and Against SCHNEIDER, BAEG, BROWN and KABAJOUZIAN)

78.   Plaintiff realleges all preceding paragraphs.

79.   Defendants' acts, omissions, misrepresentations, practices, and non-disclosures constitute unlawful, unfair, and fraudulent business acts and practices within the meaning of California Business & Professions Code Section 17200 et seq.

80.   Defendants have engaged in "unlawful" business acts and practices by engaging in conduct that violates the CLRA.

81.   Defendants have also engaged in "fraudulent" business acts or practices by engaging in aforementioned fraudulent conduct and by engaging in conduct that is likely to deceive investors and the general public.

82.   Defendants have also engaged in "unfair" business acts or practices in that defendants' conduct is outweighed by the gravity of the resulting harm, particularly considering the available alternatives, and offends public policy, is immoral, unscrupulous, unethical, and offensive, or causes substantial injury to consumers.

83.   The above described unlawful, fraudulent, or unfair business acts and practices conducted by defendants continue to this day and present a threat to plaintiffs and the general public in that defendants have failed to publicly acknowledge the wrongfulness of their actions and provide full equitable injunctive and monetary relief as required by California law.

84.   Pursuant to California Business & Professions Code Section 17203, plaintiffs seek an order of this Court requiring defendants to immediately cease such acts of unfair competition and enjoining defendants from continuing to conduct business via the unlawful, fraudulent, and/or unfair business acts and practices set forth in this Complaint and from failing to fully disclose the true nature of their misrepresentations, and ordering defendants to engage in a corrective notice and advertising campaign.

85.   Plaintiffs additionally request an order from the Court requiring that defendants provide complete equitable monetary relief so as to prevent defendants from

1  benefitting from the practices that constitute unfair competition or the use or employment

2  of any monies resulting from the practices, including requiring the payment of restitution

3  of any monies as may be necessary to restore to any member of the general public any

4  money or property which may have been acquired by means of such acts of unfair

5  competition.

6      86.    This action will result in the enforcement of an important right affecting the

7  public interest and a significant benefit will be conferred on the general public or a large

8  class of persons. Accordingly, under Code of Civil Procedure § 1021.5, plaintiffs are

9  entitled to reasonable attorney fees according to proof.

10                        **FIFTH CLAIM FOR RELIEF**
             **Violations of the Racketeer Influenced and Corrupt Organizations Act**
11                  **(By All Plaintiffs and Against All Defendants)**

12     **87.**   Plaintiffs incorporate paragraphs 1 through 46 as if fully set forth herein.

13                        THE ENTERPRISE

14     **88.**   This claim arises under 18 U.S.C. § 1962(a)-(d) and is brought by all

15  plaintiffs against all defendants.

16     **89.**   BAEG is a California limited liability company which was formed in 2008

17  for, among other purposes, soliciting investment funds from individuals for the purpose

18  of obtaining large sums of money from individuals desiring to grow their retirement

19  monies. BAEG was formed primarily to engage in a ponzi scheme to fleece unwitting

20  investors out of millions of dollars.

21     **90.**   KABAJOUZIAN is and has been an officer, director, agent, member,

22  manager, and employee of BAEG for all times relevant to this action. He is the Chief

23  Operating Officer of BAEG.

24     **91.**   BROWN was previously an officer, agent, member, manager, and employee

25  of BAEG for all times relevant to this action. He was designated by BAEG as the

26  Premier Client Relationship Manager. Plaintiffs were deemed premier clients. BROWN

27  also held himself out as the Chief Financial Officer of BAEG.

28     **92.**   ROCHE is and has been an employee and agent of BAEG for all times

1   relevant to this action.  ROCHE was designated the Transaction Coordinator for BAEG

2   and it was her obligation to process the purchases of the properties.

3       93.     NAVA is and has been an employee and agent of BAEG for all times

4   relevant to this action.  NAVA replaced ROCHE as the Transaction Coordinator.

5       94.     SCHNEIDER is and has been an employee and agent of BAEG for all times

6   relevant to this action.  SCHNEIDER's title is unknown at this time but he actively

7   participated in the sale of property to plaintiffs and was copied on numerous emails.

8       95.     At all times relevant to this Complaint, all defendants and others known and

9   unknown to plaintiffs constitute an "Enterprise" as that term is defined in 18 U.S.C. §

10  1961(4), that is, a group of individuals and legal entities associated in fact.  The

11  Enterprise constitutes an ongoing organization whose members are functioning as a

12  continuing unit for a common purpose of achieving the objectives of the Enterprise.  The

13  Enterprise was and is engaged in a pattern of racketeering activity that affects interstate

14  and foreign commerce.  Therefore, defendants have violated 18 U.S.C. § 1962(a).

15      96.     Defendants, through the conduct described herein, acquired, maintained,

16  and exercised control over the Enterprise, which was and is engaged in a pattern of

17  racketeering activity that affects interstate and foreign commerce. Therefore, defendants

18  have violated 18 U.S.C. § 1962(b).

19      97.     In violation of 18 U.S.C. § 1962(c), defendants have conducted or

20  participated, directly or indirectly, in the conduct of the affairs of the Enterprise through a

21  pattern of racketeering activity as defined by 18 U.S.C. § 1961(5).

22      98.     At all relevant times, defendants were "persons" within the meaning of 18

23  U.S.C. § 1961(3) because each was capable of holding a legal or beneficial interest in

24  property.

25      99.     The Enterprise constituted a single enterprise or multiple enterprises

26  withing the meaning of 18 U.S.C. § 1961(4), as individuals and other entities associated-

27  in-fact for common purpose of engaging in defendants' profit-making scheme.

28      100.    The Enterprise was created and/or used as a tool to carry out the elements of

1   defendants' illicit scheme and pattern of racketeering activity.  The Enterprise has

2   ascertainable structures and purposes beyond the scope and commission of defendants'

3   predicate acts and conspiracy to commit such acts.  The Enterprise is separate and distinct

4   from defendants.

5          **101.**   The Enterprise has engaged in, and its activities affected, interstate

6   commerce by soliciting investments from hundreds, if not thousands, of people within the

7   United States.

8          **102.**   The Enterprise actively disguised the nature of defendants' wrongdoing and

9   concealed or misrepresented defendants' participation in the conduct of the Enterprise to

10  maximize profits.

11         **103.**   Each defendant exerted substantial control over the Enterprise and

12  participated in the operation and managed the affairs of the Enterprise.

13         **104.**   Defendants have committed or aided and abetted the commission of at least

14  two acts of racketeering activity, i.e., indictable violations of 18 U.S.C. §§ 1341 and

15  1343, within the past ten years.  The multiple acts of racketeering activity which

16  defendants committed and/or conspired to, or aided and abetted in the commission of,

17  were related to each other, pose a threat of continuing racketeering activity, and therefore

18  constitute a pattern of racketeering activity.

19                          PATTERN OF RACKETEERING ACTIVITY

20         **105.**   Defendants' predicate acts of racketeering within the meaning of 18 U.S.C.

21  § 1961(a) include, but are not limited to:

22                  (a)      **Mail Fraud**: Defendants have violated 18 U.S.C. § 1341 by sending

23                           or receiving materials via U.S. mail or commercial interstate carriers

24                           for the purpose of executing their scheme to defraud investors.

25                  (b)      **Wire Fraud**: Defendants have violated 18 U.S.C. § 1343 by

26                           transmitting and receiving materials by wire, including e-mail, for

27                           the purpose of executing their scheme to defraud investors.

28         **106.**   From the date of BROOKS' attendance at the chamber luncheon where

1 | SCHNEIDER made a presentation on behalf of BAEG, through the date of the filing of

2 | this lawsuit, defendants have engaged in dozens of acts of mail and wire fraud. Countless

3 | communications, too many to enumerate here, were sent by each of the defendants to

4 | plaintiffs by regular mail and electronic mail to further the Enterprise.

5 |      **107.**   Additionally, plaintiffs are informed and believe that additional specific acts

6 | of mail and wire fraud were utilized by defendants to further the Enterprise that evidence

7 | of such acts are within the exclusive knowledge of the defendants and other persons

8 | unknown to plaintiffs at this time.

9 |      **108.**   Defendants predicate acts constitute a pattern of racketeering activity

10 | because the common purpose of each act was to defraud plaintiffs of their money, the

11 | common result of the acts was the same, and defendants all personally participated in the

12 | acts.

13 | <div align="center">SPECIFIC ACTS OF RACKETEERING ACTIVITY</div>

14 |      **109.**   On June 14, 2012, BAEG sent BROOKS and LEONG two letters by email

15 | that reiterated the option to extend the rental protection plan and the home warranty on

16 | the ESF and Newport 1 properties. These letters notified BROOKS AND LEONG that

17 | the cost for these items had increased from the "10% of rent" cost represented to plaintiffs

18 | at the time the properties were purchased. Nonetheless, plaintiffs chose to extend both

19 | options for another twelve months.

20 |      **110.**   On January 7, 2013, BROWN sent brooks an electronic mail

21 | communication confirming the date and time of a meeting with BROOKS and LEONG.

22 | BROOKS and LEONG had made a written request for a meeting at which they

23 | demanded: back rents, operating statements for all properties, information relating to the

24 | tax situation and reimbursement of the tax monies paid by plaintiffs, and sale closing

25 | papers for each property. BROWN promised that all of the requested information would

26 | be provided at the meeting. It wasn't.

27 |      **111.**   On June 13, 2013, KABAJOUZIAN sent BROOKS an email promising that

28 | the late payments were going to be made at some point in the future. KABAJOUZIAN

1  claimed in this communication that the vandalized properties somehow "slipped through

2  the cracks" failing to acknowledge any wrongdoing on the part of the Enterprise.

3      **112.** As mentioned above, ROCHE emailed BROOKS purchase agreements and

4  projected investment documents on April 15, 2011, and copied BAEG and SCHNEIDER

5  on the correspondence as BAEG and SCHNEIDER were overseeing ROCHE's duties..

6      **113.** On April 19, ROCHE sent BROOKS another email acknowledging receipt

7  of the purchase agreements and informing BROOKS that the Rossiter Property was not

8  available. ROCHE offered a different and "better" investment home and included a

9  purchase agreement for the ESF property.

10     <u>THE PURPOSE OF THE ENTERPRISE</u>

11     **114.** From its inception, the Enterprise was crafted and constructed by

12 defendants for the purpose of acquiring substantial sums of money under false pretenses

13 to benefit defendants and other unknown persons that participated in the Enterprise.

14 Specifically, the Enterprise makes false promises and misrepresents material facts to

15 induce investors to turn over substantial sums of money for sham investments. The

16 Enterprise then fails to pay the duped investors as promised.

17     <u>INJURY IN FACT</u>

18     **115.** As a direct and proximate result of the defendants' conduct alleged herein,

19 plaintiffs have suffered actual, incidental, and consequential damages. Defendants'

20 conduct is despicable, was committed intentionally, with malice and oppression justifying

21 an award of treble damages and attorney fees and costs.

22     **SIXTH CLAIM FOR RELIEF**
    **Civil Conspiracy**

23     **(By All Plaintiffs and Against All Defendants)**

24     **116.** Plaintiffs incorporate paragraphs One through 49 as if fully set forth herein.

25     **117.** This claim is brought by all plaintiffs against all defendants.

26     **118.** Defendants entered into ore or more express or implied

27 agreements/understandings pertaining to the establishment of BAEG to defraud investors

28 out of significant sums of money. The defendants conspired to take the victims' funds

1 | and use them for their own purposes.

2 | **119.**   Numerous unlawful acts were committed to further the conspiracy,

3 | including the collection of rents, and the conversion of those rents for defendants' own

4 | purposes.

5 | **120.**   Defendants had knowledge that each of the other defendants intended to

6 | defraud the plaintiffs and agreed and intended that the fraud be committed.

7 | **121.**   The defendants acted with malice, willful, wanton, and/or reckless

8 | disregard for plaintiffs' assets and well being.

9 | **122.**   As a direct and proximate result of defendants' participation in an unlawful

10 | civil conspiracy, the plaintiffs have sustained actual, incidental, and consequential

11 | damages.

12 | **123.**   All conditions precedent and subsequent to plaintiffs' right to bring this

13 | claim have been performed, waived, or have otherwise occurred.

### SEVENTH CLAIM FOR RELIEF
#### Breach of Fiduciary Duty
14 |
15 | **(By All Plaintiffs and Against SCHNEIDER, BAEG, KABAJOUZIAN AND BROWN)**

16 |
17 | **124.**   Plaintiffs incorporate paragraphs One through 49 as if fully set forth herein.

18 | **125.**   Defendants (individually and/or through one or more other defendants)

19 | expressly and impliedly invited and importuned plaintiffs to repose special trust and

20 | confidence in them as professionals possessing superior knowledge, training, skill, and

21 | abilities in developing, evaluating, implementing and monitoring non-traditional

22 | investments for plaintiffs' benefit.  Additionally, defendants agreed to assume

23 | responsibility to mange the properties for plaintiffs and to collect the rents on behalf of

24 | plaintiffs.

25 | **126.**   As a result of defendants' representations, plaintiffs reasonably and

26 | justifiably chose to repose special trust and confidence in defendants and continued to do

27 | so until BAEG "terminated" plaintiffs in May of 2013.

28 | **127.**   Based upon defendants' representations, promises, commitments, and

advice, plaintiffs entered into contractual relationships with the defendants.  Plaintiffs

1 purchased eight properties and management, custodian, and financial services from

2 defendants.

3     **128.** Defendants held themselves out to plaintiffs as possessing specialized and

4 superior education and knowledge in the investments that plaintiffs were making. At all

5 times material herein, plaintiffs were solicited, importuned and induced to repose special

6 trust and confidence in the defendants with respect to the investments and services.

7     **129.** As a result of the inducements and representations, plaintiffs reasonably and

8 justifiably reposed special trust and confidence in defendants relating to the investments

9 and services.

10     **130.** Moreover, the rents collected by defendants belong to plaintiffs.

11 Defendants should be considered to be holding the funds in a constructive trust on behalf

12 of plaintiffs. Because defendants converted the trust funds to their own use, defendants

13 have breached a fiduciary duty to plaintiffs.

14     **131.** As a direct and proximate result of defendants' material misrepresentations

15 and omissions, and as a direct and proximate result of defendants' breaches of duties

16 owed to plaintiffs, plaintiffs have suffered money damages in an amount to be proven at

17 trial.

18     **132.** Defendants breached their fiduciary duties owed to plaintiffs as outlined

19 herein.

20     **133.** The material breaches of fiduciary duties by defendants were attended by

21 circumstances of malice and willful, wanton and/or reckless misconduct.

22        **EIGHTH CLAIM FOR RELIEF**
**Aiding and Abetting**

23 **(By Plaintiff and Against All Defendants)**

24     **134.** Plaintiffs incorporate paragraphs One through 49 as if fully set forth herein.

25     **135.** Plaintiffs were harmed by defendants' BAEG's fraud and all other

26 defendants are responsible as they aided and abetted BAEG in committing the fraud.

27     **136.** Defendants knew or should have known that fraud was being committed

28 against plaintiffs and defendants gave substantial assistance and/or encouragement to

1  BAEG and each defendants' conduct was a substantial factor in causing harm to the

2  plaintiffs.

3                          **NINTH CLAIM FOR RELIEF**
                              **Breach of Contract**
4         **(By Plaintiff and Against BAEG, KABAJOUZIAN and BROWN)**

5         137.   Plaintiffs incorporate paragraphs One through 49 as if fully set forth herein.

6         138.   As alleged above, BROOKS and LEONG, as trustees of the TRUST,

7  purchased four properties and entered into written contracts with the above named

8  defendants. The contracts are attached hereto as Exhibits A, B, C and D.

9         139.   Plaintiffs paid consideration under each contract to purchase the properties and

10 services alleged above.

11        140.   LRB purchased also purchased four properties and accompanying services

12 from the above named defendants and entered into written contracts for the same. The

13 contracts are attached hereto as Exhibits E, F, G and H.

14        141.   All eight contracts have been breached as defendants have failed to make the

15 payments required under the contracts, uphold their obligations under the rental protection

16 plans, and honor the home warranties provided by each contract.

17        142.   Plaintiffs have been damaged by defendants' breach of the contracts.

18                          **TENTH CLAIM FOR RELIEF**
                                  **Rescission**
19        **(By Plaintiffs and Against BAEG, KABAJOUZIAN, and BROWN)**

20        143.   Plaintiffs incorporate paragraphs One through 49 as if fully set forth herein.

21        144.   Plaintiffs allege that the contracts at issue were procured by defendants by

22 fraudulent and unlawful means. Pursuant to Civil Code § 1689, plaintiffs are entitled to

23 rescind the contracts as a matter of law.

24                          **ELEVENTH CLAIM FOR RELIEF**
                               **Declaratory Relief**
25        **(By Plaintiffs and Against BAEG, KABAJOUZIAN and BROWN)**

26        145.   Plaintiffs incorporate paragraphs One through 49 as if fully set forth herein.

27        146.   A dispute has arisen and an actual controversy exists between plaintiffs and

28 defendants. Plaintiffs contends they are entitled to payment on the contracts, plus interest,

1   reimbursement of undisclosed account fees, back rents, property taxes, prejudgment interest

2   and attorney fees and costs, whereas defendants deny the same and refuse to pay the amounts

3   requested.

4       **147.**   Plaintiffs have no speedy or adequate remedy at law in that defendants my

5   liquidate assets and/or transfer assets which may be used to satisfy the obligations described

6   herein.

7       **148.**   Plaintiffs seek a declaration from the Court outlining each parties' rights and

8   obligations under the contracts at issue

9                        **TWELFTH CLAIM FOR RELIEF**
                                    **Conversion**
10          **(By Plaintiffs and Against BAEG, KABAJOUZIAN and BROWN**

11      **149.**   Plaintiffs incorporate paragraphs One through 49 as if fully set forth herein.

12      **150.**   Plaintiffs own the guaranteed monthly payments from their investments.  By

13  failing to pay the amounts due to plaintiffs in a timely manner, defendants have

14  wrongfully converted plaintiffs' funds and have dispossessed plaintiffs of the remaining

15  balances due.

16      **151.**   As a direct and proximate result of defendants' conversion, plaintiffs have

17  sustained damages.

18      **152.**   Plaintiffs allege that defendants are intentionally withholding plaintiffs'

19  funds and are acting with malice, oppression and fraud.

20                      **THIRTEENTH CLAIM FOR RELIEF**
    **False Advertising-violation of Business and Professions Code Sections 17500, et Seq.**
21    **(By All Plaintiffs and Against SCHNEIDER, BAEG, KABAJOUZIAN and**
                                    **BROWN)**
22
        **153.**   Plaintiffs incorporate paragraphs One through 49 as if fully set forth herein.
23
        **154.**   Beginning at an exact date unknown to plaintiffs but at least since April of
24
    2011, defendants have committed acts of false advertising as defined by Business &
25
    Professions Code § 17500, by engaging in the acts described in paragraphs 1 through 49.
26
        **155.**   Defendants intended to dispose of personal property or services by its
27
    advertisement of the investment scam.
28
        **156.**   Defendants publicly disseminated advertising which contained a statement

1    that was untrue or misleading, and which defendants knew, or in the exercise of

2    reasonable care should have known, was untrue and misleading, and which concerned the

3    investment scam.

4         **157.**    Plaintiffs justifiably relied on the advertising disseminated by defendants

5    and was damaged as a result of the advertising being false.

6         **158.**    Plaintiffs are entitled to injunctive relief, restitution, damages, and civil

7    penalties.

8                   **THIRTEENTH CLAIM FOR RELIEF**
                      **Constructive Trust**

9        **(By Plaintiffs and Against BAEG, KABAJOUZIAN and BROWN)**

10         **159.**    Plaintiffs incorporate paragraphs One through 49 as if fully set forth herein.

11         **160.**    Defendants acquired proceeds from the eight properties sold to plaintiffs and

12    agreed to manage the properties and collect rents on behalf of plaintiffs.

13         **161.**    Defendants have collected rents from the properties and hold these proceeds in

14    a constructive trust for plaintiffs until these proceeds are fully paid to plaintiffs.

15         **162.**    Plaintiffs seek a judgment from the Court declaring that defendants' interest in

16    the proceeds are and shall be held in a constructive trust for plaintiffs until these proceeds are

17    fully paid to plaintiffs.

18                       <u>PRAYER FOR RELIEF</u>

19        WHEREFORE, plaintiffs pray for judgment as follows:

20         1.      Pursuant to Civil Code § 1780, Business and Professions Code §§ 17203

21    and 17535, and pursuant to the equitable powers of this Court, plaintiffs pray that the

22    defendants be preliminarily and permanently enjoined from committing the acts and

23    practices described above.

24         2.      That the contracts be adjudged rescinded.

25         3.      For restitution.

26         4.      Actual damages according to proof.

27         5.      Civil penalties.

28         6.      Incidental and consequential damages.

1    7.   Reasonable attorney fees, costs and expenses.

2    8.   Treble damages.

3    9.   All other appropriate relief.

4    10.  Statutory damages.

5    11.  Punitive damages.

6    12.  Prejudgment interest.

7    13.  For a declaratory judgment declaring the rights and obligations of the parties

8         under the contracts at issue herein.

9    14.  For a declaratory judgment declaring that defendants' interest in the proceeds

10        are and shall be held in a constructive trust for plaintiffs until these proceeds

11        are fully paid to plaintiffs.

12

13                        <u>DEMAND FOR TRIAL BY JURY</u>

14   Plaintiffs hereby demand trial by jury.

15

16

17   Dated:      July 16, 2013          TERRY L. BAKER, ATTORNEY AT LAW

18

19

20                                     TERRY L. BAKER
                                       Attorneys for Plaintiff

21

22

23

24

25

26

27

28

**EXHIBIT A**

## OFFER TO PURCHASE REAL ESTATE

1. THE UNDERSIGNED hereby offers and agrees to purchase the following land situated in the City of Detroit Wayne County, Michigan, described as follows: 10137 McKinney Street, Detroit, MI 48224

being commonly known as ▬▬▬▬▬▬ (Street), together with all improvements and appurtenances, including all lighting fixtures, window treatments, storm windows and storm doors, screens, awnings, TV antenna, if any, now on the premises, and to pay therefore the sum of $27,995.00 Dollars, subject to the existing building and use restrictions, easements and zoning ordinances, if any, upon the following conditions:

THE SALE TO BE CONSUMMATED BY: (Fill in one of the four following paragraphs, and strike out the remainder.)

A. CASH SALE. Delivery of the usual Warranty Deed conveying a marketable title. Payment of purchase money is to be made in cash or certified check.

B. ~~CASH SALE WITH NEW MORTGAGE. Delivery of the usual Warranty Deed conveying a marketable title. Payment of purchase money is to be made in cash or certified check. This agreement is contingent upon the purchaser being able to secure a _____ mortgage in the amount of $_____ for a term of _____ years and pay $_____ down plus mortgage costs, prepaid items, and adjustments in cash. Purchaser agrees to apply for such mortgage within _____ days from acceptance of this offer at his own expense. If a commitment for such mortgage cannot be obtained within _____ days from date of acceptance, at the Seller's option, this offer can be declared null and void and deposit shall be returned.~~

C. ~~SALE TO EXISTING MORTGAGE. Delivery of the usual Warranty Deed conveying a marketable title, subject to mortgage to be deducted from the purchase price. Payment of the purchase money is to be made in cash or certified check less the amount owing upon an existing mortgage now on the premises, with accrued interest to date of consummation, held by _____ upon which there is unpaid the sum of approximately _____ Dollars with interest at _____ per cent, which mortgage requires payments of $_____ Dollars on the _____ day of each and every month, which payments DO, DO NOT include prepaid taxes and insurance. If the Seller has any accumulated funds held in escrow for the payment for any prepaid items, the Purchaser agrees to reimburse the Seller upon proper assignment of same. The Purchaser agrees to assume and pay said mortgage according to the terms thereof.~~

D. ~~SALE ON LAND CONTRACT. Payment of the sum of $_____ Dollars in cash or certified check, and the execution of a Land Contract acknowledging payment of that sum and calling for the payment of the remainder of the purchase money within _____ years from the date of Contract in monthly payments of not less than _____ Dollars each commencing _____ which include interest payments at the rate of _____ per cent per annum, which DO, DO NOT include prepaid taxes and insurance.~~

~~If the Seller's title to said land is evidenced by an existing land contract with unperformed terms and conditions substantially as above set forth and the cash payment to be made by the undersigned on consummation hereof will pay out the equity, an assignment and conveyance of the vendee's interest in the land contract with an agreement by the undersigned to assume the balance owing thereof, will be accepted of the contract proposed in the preceding paragraph. If the Seller has any accumulated funds held in escrow for the payment of prepaid taxes or insurance, the Purchaser agrees to reimburse the Seller upon the proper assignment of same.~~

2. The Seller shall deliver and the Purchaser shall accept possession of said property, subject to the rights of the following tenants: N/A . If the Seller occupies the property it shall be vacated on or before N/A days after closing. From the date of closing to the date of vacation the property as Agreed, SELLER SHALL PAY the sum of $ zero per day. THE BROKER SHALL RETAIN from the amount due Seller at closing the sum of $ zero as security for said occupancy charge, paying to the Purchaser the amount due him and returning to the Seller the unused portion as determined by date property is vacated and keys surrendered to Broker.

3. The Broker is hereby authorized to make this offer and the deposit of $ 1,500.00 Dollars in form of cash, check, note, shall be held by him under P.A. 299 of 1980, as amended, and applied on the purchase price if the sale is consummated.

4. ~~APPLICABLE TO V.A. OR F.H.A. SALES ONLY: It is expressly agreed that, notwithstanding any other provisions of this contract, the Purchaser shall not be obligated to complete the purchase of the property described herein or to incur any penalty by forfeiture of earnest money deposits or otherwise unless the Seller has delivered to the Purchaser a written statement issued by the Veterans Administration or Federal Housing Commissioner setting forth the appraised value of the property for mortgage insurance purposes of not less than $_____ which statement the Seller hereby agrees to deliver to the Purchaser promptly after such appraised value statement is made available to the Seller. The Purchaser shall, however, have the privilege and option of proceeding with the consummation of this contract without regard to the amount of the appraised valuation made by the Veterans Administration or Federal Housing Commissioner. It is further understood between Purchaser and Seller that the additional personal property listed herein has a value of $_____.~~

Purchasers Initials _____ _____          Sellers Initials _____ _____

1

# GENERAL CONDITIONS

5. As evidence of title, Seller agrees to furnish Purchaser as soon as possible, a commitment for Title Insurance in an amount not less than the purchase price, bearing date later than the acceptance hereof and guaranteeing the title in the condition required for performance of this order, or a complete abstract of title and tax history certified to a date later than the acceptance hereof.

6. If this offer is accepted by the Seller and if title can be conveyed in the condition required hereunder, the Purchaser agrees to complete the sale within 10 days after delivery of the abstract of Commitment of title insurance; however, if the sale is to be consummated in accordance with paragraph 8, then closing will be governed by the time there specified for obtaining a mortgage in the event of default by the Purchaser hereunder, the Seller may, at his option, elect to enforce the terms hereof or declare a forfeiture hereunder and retain the deposit as liquidated damages.

7. In the event of default by the Seller hereunder, the Purchaser may, at his option, elect t enforce the terms hereof or demand, and be entitled to, an immediate refund of his entire deposit in full termination of this agreement.

8. If objection to the title is made, based upon a written opinion of Purchaser's attorney that the title is not in the condition required for performance hereunder, the Seller shall have 30 days from the date he is notified in writing of the particular defects claimed, either (1) to remedy the title, of (2) to obtain title insurance as required above, or (3) to refund deposit in full termination of this agreement if unable to remedy the title or obtain title insurance. If the Seller remedies the title or shall obtain such title policy within the time specified, the Purchaser agrees to complete the sale within 10 days of written notification thereof. If the Seller is unable to remedy the title or obtain title insurance within the time specified the deposit shall be refunded forthwith in full termination of this agreement.

9. All taxes and assessments which have become a lien upon the land and are due and payable whether recorded or not recorded, at the date of this agreement shall be paid by the Seller. Current taxes, if any, shall be prorated and adjusted as of the date of closing in accordance with DUE date basis of the municipality or taxing unit in which the property is located. For purposes of this agreement all real property taxes are to be considered paid in advance. Interest, rents and water bill shall be prorated and adjusted as of the date of closing.

10. In consideration of the Broker's effort to obtain the Seller's approval, it is understood that this offer is irrevocable for FIVE days from the date hereof and if not accepted by the Seller within that time, the deposit shall be returned forthwith to the Purchaser. If the offer is accepted by the Seller, the Purchaser agrees to complete the purchase of said property within the time indicated I paragraph 6.

11. Any closing fees charged for services rendered by a bank, title company or escrow company shall be paid by the purchaser except where the payment of same shall be prohibited by law, in which case such fee shall be paid by the seller.

12. The Purchaser and Seller acknowledge and agree that the broker may act as their agent in obtaining mortgage financing, casualty insurance, title insurance or such other items that are necessary to consummate the sale.

13. By the execution of this instrument the Purchaser acknowledges, THAT HE HAS EXAMINED THE ABOVE described premises and is satisfied with the Physical condition of structure thereon and purchases said property in an "as is condition," also acknowledges the receipt of a copy of this offer. It is further understood and agreed that THE BROKER, does not warrant the condition of the property, nor assume any responsibility for the representation made by the seller pertaining to the condition of the property. It is further understood that no promises have been made other than those that are in writing and signed by all parties involved (no verbal agreements will be binding.)

14. MORTGAGE CREDIT. All purchase agreements originated as of 8/16/76 must indicate that the responsibility of repairs is the seller's at the time of firm application. If this information is lacking, HUD-FHA will no longer assume that this is the seller's responsibility, and will reject the application.

15. The covenants and conditions herein shall bind and inure to the benefits of the executors, administrators, successors and assigns of the respective parties. If the parties herein be more that one or if they be of the feminine sex, or a corporation or other business entity, such words and pronouns and other relative words shall be read as if written in the plural, feminine and neuter, respectively.

16. We hereby acknowledge that this offer constitutes the entire agreement between the parties.

ADDITIONAL CONDITIONS (If Any):

Seller agrees to a one (1) year maintenance warranty on said property. This shall cover any general maintenance not covered by the homeowner's insurance.

Seller agrees to guarantee tenancy for twelve (12) months. If property is unoccupied for the term noted, Seller will cover gross rents as outlined in 'Property Tracker Performance Projection' minus taxes.

Purchasers Initials AB PL Sellers Initials L

PURCHASER:

IN PRESENCE OF:

X _____ L.S.
  Lawrence R. Brooks

X _____ L.S.
  Darlene G. Leong

Dated _____

Address _____

1627 Hallbrook Drive

San Jose, CA 95124

Phone ( 408 ) 589-4765 / 408-978-8000

BROKER'S ACKNOWLEDGEMENT OF DEPOSIT

Received from the above-named Purchaser the deposit money above-mentioned, which will be applied as indicated in paragraph's 3 and 40, or will be returned forthwith after tender if the foregoing offer and deposit is declined.

_____ Broker   By _____

This is a co-operative sale on a _____ basis with _____

ACCEPTANCE—TO THE ABOVE NAMED PURCHASER AND BROKER. The foregoing offer is accepted in accordance with the terms stated, and upon consummation Seller hereby agrees to pay the Broker for services rendered a commission of [_____ Dollars (_____ per cent of the sale price), which shall be due and payable at the time set in said offer for the consummation of the sale, or if unconsummated, at the time of the Seller's election to refund the deposit, or at Seller's or Purchaser's failure, inability or refusal to perform the conditions of this offer; provided, however, that if the deposit is forfeited under the terms of said offer, the Seller agrees that one-half of such deposit (but not in excess of the amount of the full commission) shall be paid to or be retained by the Broker in full payment for services rendered.

By the execution of this instrument, the Seller acknowledges the receipt of a copy of this agreement.

SELLER:

IN PRESENCE OF:

X _____ L.S.
  Bay Area Equity Group, LLC

X _____ L.S.

Dated _____

Address 1601 South Bascom Avenue

Suite 1325

Campbell, CA 95008

Phone ( 408 ) 369-9244

The undersigned Purchaser hereby acknowledges the receipt of the Seller's signed acceptance of the foregoing Offer to Purchase.

Dated 4/13/11

X _____ L.S.
  Lawrence R. Brooks                    Purchaser
  Darlene G. Leong

NOTICE:  IT IS RECOMMENDED THAT YOU SEEK THE ASSISTANCE OF A LAWYER OR OTHER QUALIFIED PERSON.

3

**EXHIBIT B**

## OFFER TO PURCHASE REAL ESTATE

1. **THE UNDERSIGNED** hereby offers and agrees to purchase the following land situated in the City _____ of Detroit _____ Wayne _____ County, Michigan, described as follows: 15853 East State Fair Street

being commonly known as [redacted] _____ (Street), together with all improvements and appurtenances, including all lighting fixtures, window treatments, storm windows and storm doors, screens, awnings, TV antenna, _____ if any, now on the premises, and to pay therefore the sum of _____ $25,995.00 _____ Dollars, subject to the existing building and use restrictions, easements and zoning ordinances, if any, upon the following conditions:

**THE SALE TO BE CONSUMMATED BY: (Fill in one of the four following paragraphs, and strike out the remainder.)**

A. **CASH SALE.** Delivery of the usual Warranty Deed conveying a marketable title. Payment of purchase money is to be made in cash or certified check.

B. ~~CASH SALE WITH NEW MORTGAGE. Delivery of the usual Warranty Deed conveying a marketable title. Payment of purchase money is to be made in cash or certified check. This agreement is contingent upon the purchaser being able to secure a _____ mortgage in the amount of $ _____ for a term of _____ years and pay $ _____ from plus mortgage costs, prepaid items, and adjustments in cash. Purchaser agrees to apply for such mortgage within _____ days from acceptance of this offer at his own expense. If a commitment for such mortgage cannot be obtained within _____ days from date of acceptance, at the Seller's option, this offer can be declared null and void and deposit shall be returned.~~

C. ~~SALE TO EXISTING MORTGAGE. Delivery of the usual Warranty Deed conveying a marketable title, subject to mortgage to be deducted from the purchase price. Payment of the purchase money is to be made in cash or certified check less the amount owing upon an existing mortgage now on the premises, with accrued interest to date of consummation, held by _____ upon which there is unpaid the sum of approximately _____ Dollars, with interest of _____ per cent, which mortgage requires payments of _____ Dollars on the _____ day of each and every month, which payments DO, DO NOT include prepaid taxes and insurance. If the Seller has any accumulated funds held in escrow for the payment for any prepaid items, the Purchaser agrees to reimburse the Seller upon proper assignment of same. The Purchaser agrees to assume and pay such mortgage according to the terms thereof.~~

D. ~~SALE ON LAND CONTRACT. Payment of the sum of _____ Dollars in cash or certified check, and the execution of a Land Contract acknowledging payment of that sum and calling for the payment of the remainder of the purchase money within _____ years from the date of Contract in monthly payments of not less than _____ Dollars each assuming _____ which include interest payments at the rate of _____ per cent per annum, which DO, DO NOT include prepaid taxes and insurance.~~

~~If the Seller's title to said land is evidenced by an existing land contract with unperformed terms and conditions as above set forth and the cash payment to be made by the undersigned on consummation hereof will pay out the equity on assignment and conveyance of the vendee's interest in the land contract, with an agreement by the undersigned to assume the balance owing thereof, will be accepted of the contract proposed in the preceding paragraph. If the Seller has any accumulated funds held in escrow for the payment of prepaid taxes or insurance, the Purchaser agrees to reimburse the Seller upon the proper assignment of same.~~

2. The Seller shall deliver and the Purchaser shall accept possession of said property, subject to the rights of the following tenants: N/A _____ . If the Seller occupies the property it shall be vacated on or before N/A _____ days after closing. From the date of closing to the date of vacation the property as Agreed, SELLER SHALL PAY the sum of $ zero _____ per day. THE BROKER SHALL RETAIN from the amount due Seller at closing the sum of $ zero _____ as security for said occupancy charge, paying to the Purchaser the amount due him and returning to the Seller the unused portion as determined by date property is vacated and keys surrendered to Broker..

3. The Broker is hereby authorized to make this offer and the deposit of $ 1,500.00 _____ Dollars in form of cash, check, note, shall be held by him under P.A. 299 of 1980, as amended, and applied on the purchase price if the sale is consummated.

4. ~~APPLICABLE TO V.A. OR F.H.A. SALES ONLY. It is expressly agreed that, notwithstanding any other provisions of this contract, the Purchaser shall not be obligated to complete the purchase of the property described herein or to incur any penalty by forfeiture of earnest money deposits or otherwise unless the Seller has delivered to the Purchaser a written statement issued by the Veterans Administration or Federal Housing Commissioner setting forth the appraised value of the property for mortgage insurance purposes of not less than $ _____ which statement the Seller hereby agrees to deliver to the Purchaser promptly after such appraised value statement is made available to the Seller. The Purchaser shall, however, have the privilege and option of proceeding with the consummation of this contract without regard to the amount of the appraised valuation made by the Veterans Administration or Federal Housing Commissioner. It is further understood between Purchaser and Seller that the additional personal property listed herein has a value of $ _____ .~~

Purchasers Initials _____ _____          Sellers Initials _____ _____

1

## GENERAL CONDITIONS

5. As evidence of title, Seller agrees to furnish Purchaser as soon as possible, a commitment for Title Insurance in an amount not less than the purchase price, bearing date later than the acceptance hereof and guaranteeing the title in the condition required for performance of this order, or a complete abstract of title and tax history certified to a date later than the acceptance hereof.

6. If this offer is accepted by the Seller and if title can be conveyed in the condition required hereunder, the Purchaser agrees to complete the sale within 10 days after delivery of the abstract of Commitment of title insurance; however, if the sale is to be consummated in accordance with paragraph B, then closing will be governed by the time there specified for obtaining a mortgage in the event of default by the Purchaser hereunder, the Seller may, at his option, elect to enforce the terms hereof or declare a forfeiture hereunder and retain the deposit as liquidated damages.

7. In the event of default by the Seller hereunder, the Purchaser may, at his option, elect t enforce the terms hereof or demand, and be entitled to, an immediate refund of his entire deposit in full termination of this agreement.

8. If objection to the title is made, based upon a written opinion of Purchaser's attorney that the title is not in the condition required for performance hereunder, the Seller shall have 30 days from the date he is notified in writing of the particular defects claimed, either (1) to remedy the title, of (2) to obtain title insurance as required above, or (3) to refund deposit in full termination of this agreement if unable to remedy the title or obtain title insurance. If the Seller remedies the title or shall obtain such title policy within the time specified, the Purchaser agrees to complete the sale within 10 days of written notification thereof. If the Seller is unable to remedy the title or obtain title insurance within the time specified the deposit shall be refunded forthwith in full termination of this agreement.

9. All taxes and assessments which have become a lien upon the land and are due and payable whether recorded or not recorded, at the date of this agreement shall be paid by the Seller. Current taxes, if any, shall be prorated and adjusted as of the date of closing in accordance with DUE date basis of the municipality or taxing unit in which the property is located. For purposes of this agreement all real property taxes are to be considered paid in advance. Interest, rents and water bill shall be prorated and adjusted as of the date of closing.

10. In consideration of the Broker's effort to obtain the Seller's approval, it is understood that this offer is irrevocable for FIVE days from the date hereof and if not accepted by the Seller within that time, the deposit shall be returned forthwith to the Purchaser. If the offer is accepted by the Seller, the Purchaser agrees to complete the purchase of said property within the time indicated I paragraph 6.

11. Any closing fees charged for services rendered by a bank, title company or escrow company shall be paid by the purchaser except where the payment of same shall be prohibited by law, in which case such fee shall be paid by the seller.

12. The Purchaser and Seller acknowledge and agree that the broker may act as their agent in obtaining mortgage financing, casualty insurance, title insurance or such other items that are necessary to consummate the sale.

13. *By the execution of this instrument the Purchaser acknowledges,* THAT HE HAS EXAMINED THE ABOVE described premises and is satisfied with the Physical condition *of structure thereon and purchases said property in an "as is condition," also acknowledges the receipt of a copy of this* offer. It is further understood and agreed that THE BROKER, does not warrant the condition of the property, nor assume any responsibility for the representation made by the seller pertaining to the condition of the property. It is further understood that no promises have been made other than those that are in writing and signed by all parties involved (no verbal agreements will be binding.)

14. MORTGAGE CREDIT. All purchase agreements originated as of 9/15/76 must indicate that the responsibility of repairs is the seller's at the time of firm application. If this information is lacking, HUD-FHA will no longer assume that this is the seller's responsibility, and will reject the application.

15. The covenants and conditions herein shall bind and inure to the benefits of the executors, administrators, successors and assigns of the respective parties. If the parties herein be more that one or if they be of the feminine sex, or a corporation or other business entity, such words and pronouns and other relative words shall be read as if written in the plural, feminine and neuter, respectively.

16. We hereby acknowledge that this offer constitutes the entire agreement between the parties.

**ADDITIONAL CONDITIONS (If Any):**

Seller agrees to a one (1) year maintenance warranty on said property. This shall cover any general maintenance not covered by the homeowner's insurance.

Seller agrees to guarantee tenancy for twelve (12) months. If property is unoccupied for the term noted, Seller will cover gross rents as outlined in 'Property Tracker Performance Projection' minus taxes.

Purchasers Initials ________ Sellers Initials ________

PURCHASER:

IN PRESENCE OF:

X _____ L.S.
Lawrence R. Brooks

X _____ L.S.
Darlene G. Leong

Dated _____

Address _____

1627 Hallbrook Drive

San Jose, CA 95124

Phone ( 408 ) 599-4755 / 408-978-9000

BROKER'S ACKNOWLEDGEMENT OF DEPOSIT

Received from the above named Purchaser the deposit money above mentioned, which will be applied as indicated in paragraph's 3 and 49, or will be returned forthwith after tender if the foregoing offer and deposit is declined.

_____ Broker   By _____

This is a co-operative sale on a _____ basis with _____

ACCEPTANCE - TO THE ABOVE NAMED PURCHASER AND BROKER: The foregoing offer is accepted in accordance with the terms stated, and upon consummation Seller hereby agrees to pay the Broker for services rendered a commission of ($ _____ ) per cent of the sale price) which shall be due and payable at the time set in said offer for the consummation of the sale, or if unconsummated, at the time of the Seller's election to refund the deposit, or of Seller's or Purchaser's failure, inability or refusal to perform the conditions of this offer, provided, however, that if the deposit is forfeited under the terms of said offer, the Seller agrees that one-half of such deposit (but not in excess of the amount of the full commission) shall be paid to or be retained by the Broker in full payment for services rendered.

By the execution of this instrument, the Seller acknowledges the receipt of a copy of this agreement.

SELLER:

IN PRESENCE OF:

X _____ L.S.
Bay Area Equity Group, LLC

X _____ L.S.

Dated _____

Address 1901 South Bascom Avenue

Suite 1325

Campbell, CA 95008

Phone ( 408 ) 369-9244

The undersigned Purchaser hereby acknowledges the receipt of the Seller's signed acceptance of the foregoing Offer to Purchase.

Dated 4/19/11

X _____ L.S.
Lawrence R. Brooks                  Purchaser
Darlene G. Leong

NOTICE: IT IS RECOMMENDED THAT YOU SEEK THE ASSISTANCE OF A LAWYER OR OTHER QUALIFIED PERSON.

3

EXHIBIT C

## OFFER TO PURCHASE REAL ESTATE

1. THE UNDERSIGNED hereby offers and agrees to purchase the following land situated in the City of Detroit, Wayne County, Michigan, described as follows: 4685 Newport Street, Detroit, MI 48215

being commonly known as 4685 Newport Street _____ (Street, together with all improvements and appurtenances, including all lighting fixtures, window treatments, storm windows and storm doors, screens, awnings, TV antenna, if any, now on the premises, and to pay therefore the sum of $29,995.00 _____ Dollars, subject to the existing building and use restrictions, easements and zoning ordinance, if any; upon the following conditions:

THE SALE TO BE CONSUMMATED BY: (Fill in one of the four following paragraphs, and strike out the remainder.)

A. CASH SALE. Delivery of the usual Warranty Deed conveying a marketable title. Payment of purchase money is to be made in cash or certified check.

B. CASH SALE WITH NEW MORTGAGE. [illegible]

C. SALE TO EXISTING MORTGAGE. [illegible]

D. SALE ON LAND CONTRACT. [illegible]

2. The Seller shall deliver and the Purchaser shall accept possession of said property, subject to the rights of the following tenants: N/A _____ If the Seller complies the property it shall be vacated on or before N/A days after closing. From the date of closing to the date of vacation the property as Agreed, SELLER SHALL PAY the sum of $ zero _____ per day. THE BROKER SHALL RETAIN from the amount due Seller at closing the sum of $_zero_____ as security for said occupancy charge, paying to the Purchaser the amount due him and returning to the Seller the unused portion as determined by date property is vacated and keys surrendered to Broker.

3. The Broker is hereby authorized to make this offer and the deposit of $ 1,500.00 _____ Dollars in form of cash, check, note, shall be held by him under P.A. 299 of 1960, as amended, and applied on the purchase price if the sale is consummated.

4. APPLICABLE TO V.A. OR F.H.A. SALES ONLY: [illegible]

Purchasers Initials _____  Sellers Initials _____

1

# GENERAL CONDITIONS

5. As evidence of title, Seller agrees to furnish Purchaser as soon as possible, a commitment for Title Insurance in an amount not less than the purchase price, bearing date later than the acceptance hereof and guaranteeing the title in the condition required for performance of this order, or a complete abstract of title and tax history certified to a date later than the acceptance hereof.

6. If this offer is accepted by the Seller and if title can be conveyed in the condition required hereunder, the Purchaser agrees to complete the sale within 10 days after delivery of the abstract of Commitment of title insurance; however, if the sale is to be consummated in accordance with paragraph B, then closing will be governed by the time there specified for obtaining a mortgage in the event of default by the Purchaser hereunder, the Seller may, at his option, elect to enforce the terms hereof or declare a forfeiture hereunder and retain the deposit as liquidated damages.

7. In the event of default by the Seller hereunder, the Purchaser may, at his option, elect t enforce the terms hereof or demand, and be entitled to, an immediate refund of his entire deposit in full termination of this agreement.

8. If objection to the title is made, based upon a written opinion of Purchaser's attorney that the title is not in the condition required for performance hereunder, the Seller shall have 30 days from the date he is notified in writing of the particular defects claimed, either (1) to remedy the title, or (2) to obtain title insurance as required above, or (3) to refund deposit in full termination of this agreement if unable to remedy the title or obtain title insurance. If the Seller remedies the title or shall obtain such title policy within the time specified, the Purchaser agrees to complete the sale within 10 days of written notification thereof. If the Seller is unable to remedy the title or obtain title insurance within the time specified the deposit shall be refunded forthwith in full termination of this agreement.

9. All taxes and assessments which have become a lien upon the land and are due and payable whether recorded or not recorded, at the date of this agreement shall be paid by the Seller. Current taxes, if any, shall be prorated and adjusted as of the date of closing in accordance with DUE date basis of the municipality or taxing unit in which the property is located. For purposes of this agreement all real property taxes are to be considered paid in advance. Interest, rents and water bill shall be prorated and adjusted as of the date of closing.

10. In consideration of the Broker's effort to obtain the Seller's approval, it is understood that this offer is irrevocable for FIVE days from the date hereof and if not accepted by the Seller within that time, the deposit shall be returned forthwith to the Purchaser. If the offer is accepted by the Seller, the Purchaser agrees to complete the purchase of said property within the time indicated I paragraph 6.

11. ~~Any closing fees charged for services rendered by a bank, title company or escrow company shall be paid by the purchaser except where the payment of same shall be prohibited by law, in which case such fee shall be paid by the seller.~~

12. ~~The Purchaser and Seller acknowledge and agree that the broker may act as their agent in obtaining mortgage financing, casualty insurance, title insurance or such other items that are necessary to consummate the sale.~~

13. By the execution of this instrument the Purchaser acknowledges, THAT HE HAS EXAMINED THE ABOVE described premises and is satisfied with the Physical condition of structure thereon and purchases said property in an "as is condition," also acknowledges the receipt of a copy of this offer. It is further understood and agreed that THE BROKER, does not warrant the condition of the property, nor assume any responsibility for the representation made by the seller pertaining to the condition of the property. It is further understood that no promises have been made other than those that are in writing and signed by all parties involved (no verbal agreements will be binding.)

14. ~~MORTGAGE CREDIT—All purchase agreements originated as of 9/1/78 must indicate that the responsibility of repairs is the seller's at the time of firm application. If this information is lacking, HUD-FHA will no longer assume that this is the seller's responsibility, and will reject the application.~~

15. The covenants and conditions herein shall bind and inure to the benefits of the executors, administrators, successors and assigns of the respective parties. If the parties herein be more that one or if they be of the feminine sex, or a corporation or other business entity, such words and pronouns and other relative words shall be read as if written in the plural, feminine and neuter, respectively.

16. We hereby acknowledge that this offer constitutes the entire agreement between the parties.

ADDITIONAL CONDITIONS (If Any):

Seller agrees to a one (1) year maintenance warranty on said property. This shall cover any general maintenance not covered by the homeowner's insurance.

Seller agrees to guarantee tenancy for twelve (12) months. If property is unoccupied for the term noted, Seller will cover gross rents as outlined in 'Property Tracker Performance Protection' minus taxes.

Seller to pay all of buyers' non-recurring closing costs.

Purchasers Initials [initials] Sellers Initials ______ ______

PURCHASER:

IN PRESENCE OF:

X _____  L.S.
  Lawrence R. Brooks

X _____  L.S.
  Darlene G. Leong

Dated  3/8/11                    Address

1627 Hallbrook Drive

San Jose, CA 95124

Phone ( 408 ) 599-4755 / 408-979-9000

BROKER'S ACKNOWLEDGEMENT OF DEPOSIT

Received from the above named Purchaser the deposit money above mentioned, which will be applied as indicated in paragraphs 3 and 4B, or will be returned forthwith after tender if the foregoing offer and deposit is declined.

_____ Seller   By _____

This is a co-operative sale on a _____ basis with _____

ACCEPTANCE—TO THE ABOVE NAMED PURCHASER AND BROKER: The foregoing offer is accepted in accordance with the terms stated, and upon consummation Seller hereby agrees to pay the Broker for services rendered a commission of (_____)
Dollars ($_____) per cent of the sale price which shall be due and payable at the time set in said offer for the consummation of the sale, or if consummated at the time of the Seller's election to refuse the deposit, and Seller's or Purchaser's failure, inability or refusal to perform the conditions of this offer provided, however, that if the deposit is forfeited under the terms of said offer, the Seller agrees that one half of such deposit (but not in excess of the amount of the full commission) shall be paid to or be retained by the Broker in full payment for services rendered.

By the execution of this instrument, the Seller acknowledges the receipt of a copy of this agreement.

SELLER:

IN PRESENCE OF:

X _____  L.S.
  Bay Area Equity Group, LLC

_____    X _____  L.S.

Dated _____     Address 1901 South Bascom Avenue

Suite 1126

Campbell, CA 95008

Phone ( 408 ) 369-9244

The undersigned Purchaser hereby acknowledges the receipt of the Seller's signed acceptance of the foregoing Offer to Purchase.

Dated  8/8/11              X _____  L.S.
                             Lawrence R. Brooks          Purchaser
                             Darlene G. Leong

NOTICE: IT IS RECOMMENDED THAT YOU SEEK THE ASSISTANCE OF A LAWYER OR OTHER QUALIFIED PERSON.

3

# First-Year Performance Projection

4685 Newport Street
Detroit, MI 48215
3-bedroom, 1-bath

View Map     View Comps     Export to Excel

| Square Feet | 1,299 |
|---|---|
| Initial Market Value | $28,595 |
| Purchase Price | $28,595 |
| Downpayment | $28,595 |
| Loan Origination Fees | $0 |
| Depreciable Closing Costs | $500 |
| Other Closing Costs and Fixup | $0 |
| Initial Cash Invested | $29,095 |
| Cost per Square Foot | $22 |
| Monthly Rent per Square Foot | $0.50 |



| Income | Monthly | Annual |
|---|---|---|
| Gross Rent | $650 | $7,800 |
| Vacancy Losses | $0 | $0 |
| Operating Income | $650 | $7,800 |

| Mortgage Info | First | Second |
|---|---|---|
| Loan-to-Value Ratio | 0% | 0% |
| Loan Amount | --- | --- |
| Monthly Payment | --- | --- |
| Loan Type | --- | --- |
| Term | --- | --- |
| Interest Rate | --- | --- |
| Monthly PMI | --- | |

| Expenses | Monthly | Annual |
|---|---|---|
| Property Taxes | ($100) | ($1,198) |
| Insurance | ($58) | ($700) |
| Management Fees | ($65) | ($780) |
| Leasing/Advertising Fees | $0 | $0 |
| Association Fees | $0 | $0 |
| Maintenance | $0 | $0 |
| Other | $0 | $0 |
| Operating Expenses | ($223) | ($2,678) |

| Financial Indicators | |
|---|---|
| Debt Coverage Ratio | N/A |
| Annual Gross Rent Multiplier | 4 |
| Monthly Gross Rent Multiplier | 44 |
| Capitalization Rate | 17.6% |
| Cash on Cash Return | 18% |
| Total Return on Investment | 18% |
| Total ROI with Tax Savings | 18% |

| Net Performance | Monthly | Annual |
|---|---|---|
| Net Operating Income | $427 | $5,122 |
| - Mortgage Payments | $0 | $0 |
| = Cash Flow | $427 | $5,122 |
| + Principal Reduction | $0 | $0 |
| + First-Year Appreciation | $0 | $0 |
| = Gross Equity Income | $427 | $5,122 |
| + Tax Savings | $0 | $0 |
| = GEI w/Tax Savings | $427 | $5,122 |

| Assumptions | |
|---|---|
| Real Estate Appreciation Rate | % |
| Vacancy Rate | % |
| Management Fee | 10% |
| Maintenance Percentage | % |
| Equity Share Percentage | 100% |

**EXHIBIT D**

# OFFER TO PURCHASE REAL ESTATE

1.  **THE UNDERSIGNED** hereby offers and agrees to purchase the following land situated in the City _____ of Detroit _____, Wayne _____ County, Michigan, described as follows: 1318 Alter, Detroit MI 48215

being commonly known as 1318 Alter, Detroit MI 48215 _____(Street), together with all improvements and appurtenances, including all lighting fixtures, window treatments, storm windows and storm doors, screens, awnings, TV antenna, _____, if any, now on the premises, and to pay therefore the sum of _____ $32,995 _____, Dollars, subject to the existing building and use restrictions, easements and zoning ordinances, if any, upon the following conditions:

**THE SALE TO BE CONSUMMATED BY: (Fill in one of the four following paragraphs, and strike out the remainder.)**

A.  **CASH SALE.** Delivery of the usual Warranty Deed conveying a marketable title. Payment of purchase money is to be made in cash or certified check.

B.  **CASH SALE WITH NEW MORTGAGE.** Delivery of the usual Warranty Deed conveying a marketable title. Payment of purchase money is to be made in cash or certified check. This agreement is contingent upon the purchaser being able to secure a ____ mortgage in the amount of $_____ for a term of ____ years and pay $_____ down plus mortgage costs, prepaid items, and adjustments in cash. Purchaser agrees to apply for such mortgage within ____ days from acceptance of this offer at his own expense. If a commitment for such mortgage cannot be obtained within ____ days from date of acceptance, at the Seller's option, this offer can be declared null and void and deposit shall be returned.

C.  **SALE TO EXISTING MORTGAGE.** Delivery of the usual Warranty Deed conveying a marketable title, subject to mortgage to be deducted from the purchase price. Payment of the purchase money is to be made in cash or certified check less the amount owing upon an existing mortgage now on the premises, with accrued interest to date of consummation, held by _____ upon which there is unpaid the sum of approximately _____Dollars, with interest at ____ per cent, which mortgage requires payments of _____Dollars on the ____ day of each and every month, which payments DO, DO NOT include prepaid taxes and insurance. If the Seller has any accumulated funds held in escrow for the payment for any prepaid items, the Purchaser agrees to reimburse the Seller upon proper assignment of same. The Purchaser agrees to assume and pay said mortgage according to the terms thereof.

D.  **SALE ON LAND CONTRACT.** Payment of the sum of _____Dollars in cash or certified check, and the execution of a Land Contract acknowledging payment of that sum and calling for the payment of the remainder of the purchase money within ____ years from the date of Contract in monthly payments of not less than _____Dollars each commencing _____ which include interest payments art the rate of ____ per cent per annum, which DO, DO NOT include prepaid taxes and insurance.

If the Seller's title to said land is evidenced by an existing land contract with unperformed terms and conditions substantially as above set forth and the cash payment to be made by the undersigned on consummation hereof will pay out the equity, an assignment and conveyance of the vendee's interest in the land contract, with an agreement by the undersigned to assume the balance owing thereof, will be accepted of the contract proposed in the preceding paragraph. If the Seller has any accumulated funds held in escrow for the payment of prepaid taxes or insurance, the Purchaser agrees to reimburse the Seller upon the proper assignment of same.

2.  The Seller shall deliver and the Purchaser shall accept possession of said property, subject to the rights of the following tenants: N/A _____. If the Seller occupies the property it shall be vacated on or before N/A _____ days after closing. From the date of closing to the date of vacation the property is Agreed, SELLER SHALL PAY the sum of $ zero _____ per day. THE BROKER SHALL RETAIN from the amount due Seller at closing the sum of $ zero _____ as security for said occupancy charge, paying to the Purchaser the amount due him and returning to the Seller the unused portion as determined by date property is vacated and keys surrendered to Broker.

3.  The Broker is hereby authorized to make this offer and the deposit of $ 1,500.00 _____ Dollars in form of cash, check, note, shall be held by him under P.A. 299 of 1980, as amended, and applied on the purchase price if the sale is consummated.

4.  **APPLICABLE TO V.A. OR F.H.A. SALES ONLY:** It is expressly agreed that, notwithstanding any other provisions of this contract, the Purchaser shall not be obligated to complete the purchase of the property described herein or to incur any penalty by forfeiture of earnest money deposits or otherwise unless the Seller has delivered to the Purchaser a written statement issued by the Veterans Administration or Federal Housing Commissioner setting forth the appraised value of the property for mortgage insurance purposes of not less than $_____, which statement the Seller hereby agrees to deliver to the Purchaser promptly after such appraised value statement is made available to the Seller. The Purchaser shall, however, have the privilege and option of proceeding with the consummation of this contract without regard to the amount of the appraised valuation made by the Veterans Administration or Federal Housing Commissioner. It is further understood between Purchaser and Seller that the additional personal property listed herein has a value of $_____.

Purchasers Initials _____  _____                     Sellers Initials _____  _____

1

# GENERAL CONDITIONS

5.    As evidence of title, Seller agrees to furnish Purchaser as soon as possible, a commitment for Title Insurance in an amount not less than the purchase price, bearing date later than the acceptance hereof and guaranteeing the title in the condition required for performance of this order, or a complete abstract of title and tax history certified to a date later than the acceptance hereof.

6.    If this offer is accepted by the Seller and if title can be conveyed in the condition required hereunder, the Purchaser agrees to complete the sale within 10 days after delivery of the abstract of Commitment of title insurance; however, if the sale is to be consummated in accordance with paragraph B, then closing will be governed by the time there specified for obtaining a mortgage in the event of default by the Purchaser hereunder, the Seller may, at his option, elect to enforce the terms hereof or declare a forfeiture hereunder and retain the deposit as liquidated damages.

7.    In the event of default by the Seller hereunder, the Purchaser may, at his option, elect t enforce the terms hereof or demand, and be entitled to, an immediate refund of his entire deposit in full termination of this agreement.

8.    If objection to the title is made, based upon a written opinion of Purchaser's attorney that the title is not in the condition required for performance hereunder, the Seller shall have 30 days from the date he is notified in writing of the particular defects claimed, either (1) to remedy the title, of (2) to obtain title insurance as required above, or (3) to refund deposit in full termination of this agreement if unable to remedy the title or obtain title insurance.  If the Seller remedies the title or shall obtain such title policy within the time specified, the Purchaser agrees to complete the sale within 10 days of written notification thereof.  If the Seller is unable to remedy the title or obtain title insurance within the time specified the deposit shall be refunded forthwith in full termination of this agreement.

9.    All taxes and assessments which have become a lien upon the land and are due and payable whether recorded or not recorded, at the date of this agreement shall be paid by the Seller.  Current taxes, if any, shall be prorated and adjusted as of the date of closing in accordance with DUE date basis of the municipality or taxing unit in which the property is located.  For purposes of this agreement all real property taxes are to be considered paid in advance.  Interest, rents and water bill shall be prorated and adjusted as of the date of closing.

10.   In consideration of the Broker's effort to obtain the Seller's approval, it is understood that this offer is irrevocable for FIVE days from the date hereof and if not accepted by the Seller within that time, the deposit shall be returned forthwith to the Purchaser.  If the offer is accepted by the Seller, the Purchaser agrees to complete the purchase of said property within the time indicated I paragraph 6.

11.   Any closing fees charged for services rendered by a bank, title company or escrow company shall be paid by the purchaser except where the payment of same shall be prohibited by law, in which case such fee shall be paid by the seller.

12.   The Purchaser and Seller acknowledge and agree that the broker may act as their agent in obtaining mortgage financing, casualty insurance, title insurance or such other items that are necessary to consummate the sale.

13.   By the execution of this instrument the Purchaser acknowledges, THAT HE HAS EXAMINED THE ABOVE described premises and is satisfied with the Physical condition of structure thereon and purchases said property in an "as is condition," also acknowledges the receipt of a copy of this offer.  It is further understood and agreed that THE BROKER, does not warrant the condition of the property, nor assume any responsibility for the representation made by the seller pertaining to the condition of the property.  It is further understood that no promises have been made other than those that are in writing and signed by all parties involved (no verbal agreements will be binding.)

14.   MORTGAGE CREDIT.  All purchase agreements originated as of 9/15/76 must indicate that the responsibility of repairs is the seller's at the time of firm application.  If this information is lacking, HUD-FHA will no longer assume that this is the seller's responsibility, and will reject the application.

15.   The covenants and conditions herein shall bind and inure to the benefits of the executors, administrators, successors and assigns of the respective parties.  If the parties herein be more that one or if they be of the feminine sex, or a corporation or other business entity, such words and pronouns and other relative words shall be read as if written in the plural, feminine and neuter, respectively.

16.   We hereby acknowledge that this offer constitutes the entire agreement between the parties.

ADDITIONAL CONDITIONS (If Any):
Seller agrees to a one (1) year maintenance warranty on said property.  This shall cover any general maintenance not covered by the homeowner's insurance.

Seller agrees to guarantee tenancy for twelve (12) months.  If property is unoccupied for the term noted, Seller will cover gross rents as outlined in 'Property Tracker Performance Projection' minus taxes.

Purchasers Initials _____  _____          Sellers Initials _____  _____

_____
_____
_____
_____
_____
_____
_____
_____

**PURCHASER:**

X_____ **L.S.**

IN PRESENCE OF:          Lawrence R. Brooks

X_____ **L.S.**

Darlene G. Leong

Dated _____      Address _____

1627 Hallbrook Drive

San Jose, CA 95124

Phone ( __408__ ) 599-4755 / 408-979-9000

## BROKER'S ACKNOWLEDGEMENT OF DEPOSIT

Received from the above named Purchaser the deposit money above mentioned, which will be applied as indicated in paragraph's 3 and 10, or will be returned forthwith after tender if the foregoing offer and deposit is declined.

_____ Broker    By_____

This is a co-operative sale on a _____ basis with _____

**ACCEPTANCE - TO THE ABOVE NAMED PURCHASER AND BROKER:** The foregoing offer is accepted in accordance with the terms stated, and upon consummation Seller hereby agrees to pay the Broker for services rendered a commission of (_____) Dollars (_____ per cent of the sale price), which shall be due and payable at the time set in said offer for the consummation of the sale, or if unconsummated, at the time of the Seller's election to refund the deposit, or of Seller's of Purchaser's failure, inability or refusal to perform the conditions of this offer; provided, however, that if the deposit is forfeited under the terms of said offer, the Seller agrees that one-half of such deposit (but not in excess of the amount of the full commission) shall be paid to or be retained by the Broker in full payment for services rendered.

By the execution of this instrument, the Seller acknowledges the receipt of a copy of this agreement.

**SELLER:**

X_____ **L.S.**

IN PRESENCE OF:          Bay Area Equity Group, LLC

X_____ **L.S.**

Dated _____      Address 1901 South Bascom Avenue

Suite 1325

Campbell, CA 95008

Phone ( __408__ ) 369-9244

The undersigned Purchaser hereby acknowledges the receipt of the Seller's signed acceptance of the foregoing Offer to Purchase.

Dated _____      X_____ **L.S.**

Lawrence R. Brooks          Purchaser

Darlene G. Leong

**NOTICE: IT IS RECOMMENDED THAT YOU SEEK THE ASSISTANCE OF A LAWYER OR OTHER QUALIFIED PERSON.**

www.buyareacashgroup.com

© 2004-2011 PropertyTracker.com     Terms of Service     Privacy Policy

# First-Year Performance Projection

1318 Alter
Detroit MI 48215
3-bedroom, 1-bath

| | |
|---|---|
| Square Feet | 900 |
| Initial Market Value | $32,995 |
| Purchase Price | $32,995 |
| Downpayment | $32,995 |
| Loan Origination Fees | $0 |
| Depreciable Closing Costs | $500 |
| Other Closing Costs and Fixup | $0 |
| Initial Cash Invested | $33,495 |
| Cost per Square Foot | $37 |
| Monthly Rent per Square Foot | $0.83 |



View Map     View Comps     Export to Excel

| Income | Monthly | Annual |
|---|---|---|
| Gross Rent | $750 | $9,000 |
| Vacancy Losses | $0 | $0 |
| Operating Income | $750 | $9,000 |

| Expenses | Monthly | Annual |
|---|---|---|
| Property Taxes | ($126) | ($1,512) |
| Insurance | ($60) | ($725) |
| Management Fees | ($75) | ($900) |
| Leasing/Advertising Fees | $0 | $0 |
| Association Fees | $0 | $0 |
| Maintenance | $0 | $0 |
| Other | $0 | $0 |
| Operating Expenses | ($261) | ($3,137) |

| Net Performance | Monthly | Annual |
|---|---|---|
| Net Operating Income | $489 | $5,863 |
| - Mortgage Payments | $0 | $0 |
| = Cash Flow | $489 | $5,863 |
| + Principal Reduction | $0 | $0 |
| + First-Year Appreciation | $0 | $0 |
| = Gross Equity Income | $489 | $5,863 |
| + Tax Savings | $0 | $0 |
| = GEI w/Tax Savings | $489 | $5,863 |

| Mortgage Info | First | Second |
|---|---|---|
| Loan-to-Value Ratio | 0% | 0% |
| Loan Amount | --- | --- |
| Monthly Payment | --- | --- |
| Loan Type | --- | --- |
| Term | --- | --- |
| Interest Rate | --- | --- |
| Monthly PMI | --- | --- |

| Financial Indicators | |
|---|---|
| Debt Coverage Ratio | N/A |
| Annual Gross Rent Multiplier | 4 |
| Monthly Gross Rent Multiplier | 44 |
| Capitalization Rate | 17.8% |
| Cash on Cash Return | 18% |
| Total Return on Investment | 18% |
| Total ROI with Tax Savings | 18% |

| Assumptions | |
|---|---|
| Real Estate Appreciation Rate | % |
| Vacancy Rate | % |
| Management Fee | 10% |
| Maintenance Percentage | % |
| Equity Share Percentage | 100% |

EXHIBIT E

## OFFER TO PURCHASE REAL ESTATE

1.   THE UNDERSIGNED hereby offers and agrees to purchase the following land situated in the City ___ of ___ Detroit ___ Wayne ___ County, Michigan, described as follows: 1805-07 Alter, Detroit, MI 48215 ___

being commonly known as ___ 1805-07 Alter, Detroit, MI 48215 ___ (Street) together with all improvements and appurtenances, including all lighting fixtures, window treatments, storm windows and storm doors, screens, awnings, TV antenna, ___ if any now on the premises, and to pay therefore the sum of ___ $33,165 ___ Dollars, subject to the existing building and use restrictions, easements and zoning ordinances, if any, upon the following conditions:

THE SALE TO BE CONSUMMATED BY: (Fill in one of the four following paragraphs, and strike out the remainder.)

A.   CASH SALE. Delivery of the usual Warranty Deed conveying a marketable title. Payment of purchase money is to be made in cash or certified check.

B.   CASH SALE WITH NEW MORTGAGE. Delivery of the usual Warranty Deed conveying a marketable title. Payment of purchase money is to be made in cash or certified check. This agreement is contingent upon the purchaser being able to secure a ___ mortgage in the amount of $ ___ for a term of ___ years and pay $ ___ down plus mortgage costs, prepaid items, and adjustments in cash. Purchaser agrees to apply for such mortgage within ___ days from acceptance of this offer at his own expense. If a commitment for such mortgage cannot be obtained within ___ days from date of acceptance, at the Seller's option, this offer can be declared null and void and deposit shall be returned.

C.   SALE TO EXISTING MORTGAGE. Delivery of the usual Warranty Deed conveying a marketable title, subject to mortgage to be deducted from the purchase price. Payment of the purchase money is to be made in cash or certified check less the amount owing upon an existing mortgage now on the premises, with interest and other charges being the date of consummation, held by ___ upon which there is unpaid the sum of approximately ___ Dollars, with interest at ___ per cent, which mortgage required payments of $ ___ Dollars on the ___ day of each and every month, which payments DO, DO NOT include prepaid taxes and insurance. If the Seller has any accumulated funds held in escrow for the payment of any prepaid taxes, the Purchaser agrees to reimburse the Seller upon proper assignment of same. The Purchaser agrees to assume and pay said mortgage according to the terms thereof.

D.   SALE ON LAND CONTRACT. Payment of the sum of ___ Dollars in cash or certified check, and the execution of a Land Contract acknowledging payment of that sum and calling for the payment of the remainder of the purchase money within ___ years from the date of Contract in monthly payments of not less than ___ Dollars each commencing ___ which include interest payments on the rate of ___ per cent per annum, which DO, DO NOT include prepaid taxes and insurance.

If the Seller's title to said land is evidenced by an existing land contract with unperformed terms and conditions substantially as above set forth and the cash payment to be made by the undersigned on consummation hereof will pay off the equity, an assignment and conveyance of the vendee's interest in the land contract, with an agreement by the undersigned to assume the balance owing thereof, will be accepted of the contract proposed in the preceding paragraph. If the Seller has any accumulated funds held in escrow for the payment of prepaid taxes or insurance, the Purchaser agrees to reimburse the Seller on the proper assignment of same.

2.   The Seller shall deliver and the Purchaser shall accept possession of said property, subject to the rights of the following tenants: N/A ___ . If the Seller occupies the property it shall be vacated on or before N/A ___ days after closing. From the date of closing to the date of vacation the property an Agreed, SELLER SHALL PAY the sum of $ ___ per day. THE BROKER SHALL RETAIN from the amount due Seller at closing the sum of $ ___ security for said occupancy charge, paying to the Purchaser the amount due him and returning to the Seller the unused portion as determined by date property is vacated and keys surrendered to Broker.

3.   The Broker is hereby authorized to make this offer and the deposit of $ ___ Dollars in form of cash, check, note, shall be held by him under P.A. 229 of 1953, as amended, and applied on the purchase price if the sale is consummated.

4.   APPLICABLE TO V.A. OR F.H.A. SALES ONLY: It is expressly agreed that, notwithstanding any other provisions of this contract, the Purchaser shall not be obligated to complete the purchase of the property described herein or to incur any penalty by forfeiture of earnest money deposits or otherwise unless the Seller has delivered to the Purchaser a written statement issued by the Veterans Administration or Federal Housing Commissioner setting forth the appraised value of the property for mortgage insurance purposes of not less than $ ___ which statement the Seller hereby agrees to deliver to the Purchaser promptly after such appraised value statement is made available to the Seller. The Purchaser shall, however, have the privilege and option of proceeding with the consummation of this contract without regard to the amount of the appraised valuation made by the Veterans Administration or Federal Housing Commissioner. It is further understood between Purchaser and Seller that the additional personal property listed herein has a value of $ ___

Purchasers Initials ___               Sellers Initials ___

1

# GENERAL CONDITIONS

5. As evidence of title, Seller agrees to furnish Purchaser as soon as possible, a commitment for Title Insurance in an amount not less than the purchase price, bearing date later than the acceptance hereof and guaranteeing the title in the condition required for performance of this order, or a complete abstract of title and tax history certified to a date later than the acceptance hereof.

6. If this offer is accepted by the Seller and if title can be conveyed in the condition required hereunder, the Purchaser agrees to complete the sale within 10 days after delivery of the abstract of Commitment of title insurance; however, if the sale is to be consummated in accordance with paragraph 3, then closing will be governed by the time there specified for obtaining a mortgage. In the event of default by the Purchaser hereunder, the Seller may, at his option, elect to enforce the terms hereof or declare a forfeiture hereunder and retain the deposit as liquidated damages.

7. In the event of default by the Seller hereunder, the Purchaser may, at his option, elect t enforce the terms hereof or demand, and be entitled to, an immediate refund of his entire deposit in full termination of this agreement.

8. If objection to the title is made, based upon a written opinion of Purchaser's attorney that the title is not in the condition required for performance hereunder, the Seller shall have 30 days from the date he is notified in writing of the particular defects claimed, either (1) to remedy the title, of (2) to obtain title insurance as required above, or (3) to refund deposit in full termination of this agreement if unable to remedy the title or obtain title insurance. If the Seller remedies the title or shall obtain such title policy within the time specified, the Purchaser agrees to complete the sale within 10 days of written notification thereof. If the Seller is unable to remedy the title or obtain title insurance within the time specified the deposit shall be refunded forthwith in full termination of this agreement.

9. All taxes and assessments which have become a lien upon the land and are due and payable whether recorded or not recorded, at the date of this agreement shall be paid by the Seller. Current taxes, if any, shall be prorated and adjusted as of the date of closing in accordance with DUE date basis of the municipality or taxing unit in which the property is located. For purposes of this agreement all real property taxes are to be considered paid in advance. Interest, rents and water bill shall be prorated and adjusted as of the date of closing.

10. In consideration of the Broker's effort to obtain the Seller's approval, it is understood that this offer is irrevocable for FIVE days from the date hereof and if not accepted by the Seller within that time, the deposit shall be returned forthwith to the Purchaser. If the offer is accepted by the Seller, the Purchaser agrees to complete the purchase of said property within the time indicated I paragraph 6.

11. Any closing fees charged for services rendered by a bank, title company or escrow company shall be paid by the purchaser except where the payment of same shall be prohibited by law, in which case such fee shall be paid by the seller.

12. The Purchaser and Seller acknowledge and agree that the broker may act as their agent in obtaining mortgage financing, casualty insurance, title insurance or such other items that are necessary to consummate the sale.

13. By the execution of this instrument the Purchaser acknowledges, THAT HE HAS EXAMINED THE ABOVE described premises and is satisfied with the Physical condition of structure thereon and purchases said property in an "as is condition," also acknowledges the receipt of a copy of this offer. It is further understood and agreed that THE BROKER, does not warrant the condition of the property, nor assume any responsibility for the representation made by the seller pertaining to the condition of the property. It is further understood that no promises have been made other than those that are in writing and signed by all parties involved (no verbal agreements will be binding.)

14. **MORTGAGE CREDIT.** All purchase agreements originated as of [illegible] must indicate that the responsibility of repairs is the seller's at the time of firm application. If this information is lacking, HUD-FHA will no longer assume that this is the seller's responsibility; and will reject the application.

15. The covenants and conditions herein shall bind and inure to the benefits of the executors, administrators, successors and assigns of the respective parties. If the parties herein be more that one or if they be of the feminine sex, or a corporation or other business entity, such words and pronouns and other relative words shall be read as if written in the plural, feminine and neuter, respectively.

16. We hereby acknowledge that this offer constitutes the entire agreement between the parties.

**ADDITIONAL CONDITIONS (If Any):**

Seller agrees to a one (1) year maintenance warranty on said property. This shall cover any general maintenance not covered by the homeowner's insurance.

Seller agrees to guarantee tenancy for twelve (12) months. If property is unoccupied for the term noted, Seller will cover gross rents as outlined in "Property Tracker Performance Protection" minus taxes.

Purchasers Initials ________ ________ Sellers Initials ________ ________

**PURCHASER:**

IN PRESENCE OF:

X _____ L.S.
   LRB's Direct, LLC

_____

X _____ L.S.
   Lawrence R. Brooks, Managing Member

Dated _____

Address  1627 Hallbrook Drive _____

        San Jose, CA 95124 _____

        Phone (_____ 408 _____) 599-4755 / 408-979-9000

**BROKER'S ACKNOWLEDGMENT OF DEPOSIT**

   Received from the above named Purchaser the deposit money above mentioned, which will be applied as indicated in paragraphs 3 and 15, or will be returned forthwith after tender if the foregoing offer and deposit is declined.

_____ Broker  By _____

   This is a co-operative sale on a _____ basis with _____

**ACCEPTANCE - TO THE ABOVE NAMED PURCHASER AND BROKER:** The foregoing offer is accepted in accordance with the terms stated, and upon consummation Seller hereby agrees to pay the Broker for services rendered a commission of ( _____ ) Dollars ( _____ per cent of the sale price), which shall be due and payable at the time set in said offer for the consummation of the sale, or if above-mentioned, at the time of the Seller's election to refund the deposit, or of Seller's or Purchaser's failure, inability or refusal to perform the conditions of this offer; provided, however, that if the deposit is forfeited under the terms of said offer, the Seller agrees that one-half of such deposit (but not in excess of the amount of the full commission) shall be paid to or be retained by the Broker in full payment for services rendered.

By the execution of this instrument, the Seller acknowledges the receipt of a copy of this agreement.

**SELLER:**

IN PRESENCE OF:

X _____ L.S.
   Bay Area Equity Group, LLC

_____

X _____ L.S.

Dated _____

Address  1521 South Bascom Avenue _____

        Suite 1335 _____

        Campbell, CA 95008 _____

        Phone (_____ 408 _____) 369-9244

The undersigned Purchaser hereby acknowledges the receipt of the Seller's signed acceptance of the foregoing Offer to Purchase.

Dated _____

X _____ L.S.
   LRB's Direct, LLC           Purchaser
   Lawrence R. Brooks

**NOTICE:** IT IS RECOMMENDED THAT YOU SEEK THE ASSISTANCE OF A LAWYER OR OTHER QUALIFIED PERSON.

**EXHIBIT F**

# OFFER TO PURCHASE REAL ESTATE

1. THE UNDERSIGNED hereby offers and agrees to purchase the following land situated in the City of Detroit, Wayne County, Michigan, described as follows: 2167-69 Alter, Detroit, MI 48215

being commonly known as 2167-69 Alter, Detroit, MI 48215 (Street), together with all improvements and appurtenances, including all lighting fixtures, window treatments, storm windows and storm doors, screens, awnings, TV antenna, ______________________, if any, now on the premises, and to pay therefore the sum of $64,995 ______________________ Dollars, subject to the existing building and use restrictions, easements and zoning ordinances, if any, upon the following conditions:

THE SALE TO BE CONSUMMATED BY: (Fill in one of the four following paragraphs, and strike out the remainder.)

A. CASH SALE. Delivery of the usual Warranty Deed conveying a marketable title. Payment of purchase money is to be made in cash or certified check.

B. CASH SALE WITH NEW MORTGAGE. Delivery of the usual Warranty Deed conveying a marketable title. Payment of purchase money is to be made in cash or certified check. This agreement is contingent upon the purchaser being able to secure a ____ mortgage in the amount of $______________ for a term of ____ years and pay $______________ down plus mortgage costs, prepaid items, and adjustments in cash. Purchaser agrees to apply for such mortgage within ____ days from acceptance of this offer at his own expense. If a commitment for such mortgage cannot be obtained within ____ days from date of acceptance, at the Seller's option, this offer can be declared null and void and deposit shall be returned.

C. SALE TO EXISTING MORTGAGE. Delivery of the usual Warranty Deed conveying a marketable title, subject to mortgage to be deducted from the purchase price. Payment of the purchase money is to be made in cash or certified check less the amount owing upon an existing mortgage now on the premises, with accrued interest to date of consummation, held by ______________________ upon which there is unpaid the sum of approximately ______________________ Dollars, with interest at ______ per cent, which mortgage requires payments of ______________________ Dollars on the ____ day of each and every month, which payments DO, DO NOT include prepaid taxes and insurance. If the Seller has any accumulated funds held in escrow for the payment for any prepaid items, the Purchaser agrees to reimburse the Seller upon proper assignment of same. The Purchaser agrees to assume and pay said mortgage according to the terms thereof.

D. SALE ON LAND CONTRACT. Payment of the sum of ______________________ Dollars in cash or certified check, and the execution of a Land Contract acknowledging payment of that sum and calling for the payment of the remainder of the purchase money within ______ years from the date of Contract in monthly payments of not less than ______________ Dollars each commencing ______________ which include interest payments at the rate of ____ per cent per annum, which DO, DO NOT include prepaid taxes and insurance.

If the Seller's title to said land is evidenced by an existing land contract with unperformed terms and conditions substantially as above set forth and the cash payment to be made by the undersigned on consummation hereof will pay out the equity, an assignment and conveyance of the vendee's interest in the land contract, with an agreement by the undersigned to assume the balance owing thereon, will be accepted of the contract proposed in the preceding paragraph. If the Seller has any accumulated funds held in escrow for the payment of prepaid taxes or insurance, the Purchaser agrees to reimburse the Seller upon the proper assignment of same.

2. The Seller shall deliver and the Purchaser shall accept possession of said property, subject to the rights of the following tenants: N/A ______________________. If the Seller occupies the property it shall be vacated on or before N/A ______________ days after closing. From the date of closing to the date of vacation the property as Agreed, SELLER SHALL PAY the sum of $ Zero ______________ per day. THE BROKER SHALL RETAIN from the amount due Seller at closing the sum of $ Zero ______________ as security for said occupancy charge, paying to the Purchaser the amount due him and returning to the Seller the unused portion as determined by date property is vacated and keys surrendered to Broker.

3. The Broker is hereby authorized to make this offer and the deposit of $ Zero ______________________ Dollars in form of cash, check, note, shall be held by him under P.A. 299 of 1980, as amended, and applied on the purchase price if the sale is consummated.

4. APPLICABLE TO V.A. OR F.H.A. SALES ONLY: It is expressly agreed that, notwithstanding any other provisions of this contract, the Purchaser shall not be obligated to complete the purchase of the property described herein or to incur any penalty by forfeiture of earnest money deposits or otherwise unless the Seller has delivered to the Purchaser a written statement issued by the Veterans Administration or Federal Housing Commissioner setting forth the appraised value of the property for mortgage insurance purposes of not less than $______________________ which statement the Seller hereby agrees to deliver to the Purchaser promptly after such appraised value statement is made available to the Seller. The Purchaser shall, however, have the privilege and option of proceeding with the consummation of this contract without regard to the amount of the appraised valuation made by the Veterans Administration or Federal Housing Commissioner. It is further understood between Purchaser and Seller that the additional personal property listed herein has a value of $______________________

Purchasers Initials ________ ________ Sellers Initials ________ ________

# GENERAL CONDITIONS

5. As evidence of title, Seller agrees to furnish Purchaser as soon as possible, a commitment for Title Insurance in an amount not less than the purchase price, bearing date later than the acceptance hereof and guaranteeing the title in the condition required for performance of this order, or a complete abstract of title and tax history certified to a date later than the acceptance hereof.

6. If this offer is accepted by the Seller and if title can be conveyed in the condition required hereunder, the Purchaser agrees to complete the sale within 10 days after delivery of the abstract of Commitment of title insurance; however, if the sale is to be consummated in accordance with paragraph B, then closing will be governed by the time there specified for obtaining a mortgage. In the event of default by the Purchaser hereunder, the Seller may, at his option, elect to enforce the terms hereof or declare a forfeiture hereunder and retain the deposit as liquidated damages.

7. In the event of default by the Seller hereunder, the Purchaser may, at his option, elect to enforce the terms hereof or demand, and be entitled to, an immediate refund of his entire deposit in full termination of this agreement.

8. If objection to the title is made, based upon a written opinion of Purchaser's attorney that the title is not in the condition required for performance hereunder, the Seller shall have 30 days from the date he is notified in writing of the particular defects claimed, either (1) to remedy the title, or (2) to obtain title insurance as required above, or (3) to refund deposit in full termination of this agreement if unable to remedy the title or obtain title insurance. If the Seller remedies the title or shall obtain such title policy within the time specified, the Purchaser agrees to complete the sale within 10 days of written notification thereof. If the Seller is unable to remedy the title or obtain title insurance within the time specified the deposit shall be refunded forthwith in full termination of this agreement.

9. All taxes and assessments which have become a lien upon the land and are due and payable whether recorded or not recorded, at the date of this agreement shall be paid by the Seller. Current taxes, if any, shall be prorated and adjusted as of the date of closing in accordance with DUE date basis of the municipality or taxing unit in which the property is located. For purposes of this agreement all real property taxes are to be considered paid in advance. Interest, rents and water bill shall be prorated and adjusted as of the date of closing.

10. In consideration of the Broker's effort to obtain the Seller's approval, it is understood that this offer is irrevocable for FIVE days from the date hereof and if not accepted by the Seller within that time, the deposit shall be returned forthwith to the Purchaser. If the offer is accepted by the Seller, the Purchaser agrees to complete the purchase of said property within the time indicated i paragraph 6.

11. Any closing fees charged for services rendered by a bank, title company or escrow company shall be paid by the purchaser except where the payment of same shall be prohibited by law, in which case such fee shall be paid by the seller.

12. The Purchaser and Seller acknowledge and agree that the broker may act as their agent in obtaining mortgage financing, casualty insurance, title insurance or such other items that are necessary to consummate the sale.

13. By the execution of this instrument the Purchaser acknowledges, THAT HE HAS EXAMINED THE ABOVE described premises and is satisfied with the Physical condition of structure thereon and purchases said property in an "as is condition," also acknowledges the receipt of a copy of this offer. It is further understood and agreed that THE BROKER, does not warrant the condition of the property, nor assume any responsibility for the representation made by the seller pertaining to the condition of the property. It is further understood that no promises have been made other than those that are in writing and signed by all parties involved (no verbal agreements will be binding.)

14. MORTGAGE CREDIT. All purchase agreements originated as of 8/15/76 must indicate that the responsibility of repairs is the seller's at the time of loan application. If this information is lacking, HUD-FHA will no longer assume that this is the seller's responsibility, and will reject the application.

15. The covenants and conditions herein shall bind and inure to the benefits of the executors, administrators, successors and assigns of the respective parties. If the parties hereto be more that one or if they be of the feminine sex, or a corporation or other business entity, such words and pronouns and other relative words shall be read as if written in the plural, feminine and neuter, respectively.

16. We hereby acknowledge that this offer constitutes the entire agreement between the parties.

ADDITIONAL CONDITIONS (If Any):

Seller agrees to a one (1) year maintenance warranty on said property. This shall cover any general maintenance not covered by the homeowner's insurance.

Seller agrees to guarantee tenancy for twelve (12) months. If property is unoccupied for the term noted, Seller will cover gross rents as outlined in 'Property Tender Performance Protection' minus taxes.

Purchasers Initials ________ ________ Sellers Initials ________ ________

PURCHASER:

IN PRESENCE OF:

X _____ L.S.
LRB's Direct, LLC

X _____ L.S.
Lawrence R. Brooks, Managing Member

Dated _____

Address 1927 Hallbrook Drive

San Jose, CA 95124

Phone ( 408 ) 599-4755 / 408-979-8000

**BROKER'S ACKNOWLEDGMENT OF DEPOSIT**

Received from the above named Purchaser the deposit money above mentioned, which will be applied as indicated in paragraph's 3 and 10, or will be returned forthwith after tender if the foregoing offer and deposit is declined.

_____ Dollar    By _____

This is a co-operative sale on a _____ basis with _____

**ACCEPTANCE - TO THE ABOVE NAMED PURCHASER AND BROKER:** The foregoing offer is accepted in accordance with the terms stated, and upon consummation Seller hereby agrees to pay the Broker for services rendered a commission of ( _____ ) Dollars ( _____ per cent of the sale price), which shall be due and payable at the time set in said offer for the consummation of the sale, or if consummated, at the time of the Broker's election to extend the deposit, or if Seller's of Purchaser's failure, inability or refusal to perform the conditions of this offer; provided, however, that if the deposit is forfeited under the terms of said offer, the Seller agrees that one-half of such deposit (but not in excess of the amount of the full commission) shall be paid to or be retained by the Broker in full payment for services rendered.

By the execution of this instrument, the Seller acknowledges the receipt of a copy of this agreement.

SELLER:

IN PRESENCE OF:

X _____ L.S.
Bay Area Equity Group, LLC

X _____ L.S.

Dated _____

Address 1901 South Bascom Avenue

Suite 1325

Campbell, CA 95008

Phone ( 408 ) 369-9244

The undersigned Purchaser hereby acknowledges the receipt of the Seller's signed acceptance of the foregoing Offer to Purchase.

Dated _____

X _____ L.S.
LRB's Direct, LLC                                    Purchaser

Lawrence R. Brooks

**NOTICE:** IT IS RECOMMENDED THAT YOU SEEK THE ASSISTANCE OF A LAWYER OR OTHER QUALIFIED PERSON.

3

**EXHIBIT G**

# OFFER TO PURCHASE REAL ESTATE

1. THE UNDERSIGNED hereby offers and agrees to purchase the following land situated in the City _____ of Detroit _____ Wayne _____ County, Michigan, described as follows: 219 Newport, Detroit, MI 48215 _____

being commonly known as 219 Newport, Detroit, MI 48215 _____ (Street), together with all improvements and appurtenances, including all lighting fixtures, window treatments, storm windows and storm doors, screens, awnings, TV antenna, _____ if any, now on the premises, and to pay therefore the sum of _____ $24,995 _____ Dollars, subject to the existing building and use restrictions, easements and zoning ordinance, if any, upon the following conditions:

THE SALE TO BE CONSUMMATED BY: (Fill in one of the four following paragraphs, and strike out the remainder.)

A. CASH SALE. Delivery of the usual Warranty Deed conveying a marketable title. Payment of purchase money is to be made in cash or certified check.

B. CASH SALE WITH NEW MORTGAGE. Delivery of the usual Warranty Deed conveying a marketable title. Payment of purchase money is to be made in cash or certified check. This agreement is contingent upon the purchaser being able to secure a ____ mortgage in the amount of $ _____ for a loan of ____ years and pay $ _____ down plus mortgage costs, prepaid items, and adjustments in cash. Purchaser agrees to apply for such mortgage within ____ days from acceptance of this offer at his own expense. If a commitment for such mortgage cannot be obtained within ____ days from date of acceptance, at the Seller's option, this offer can be declared null and void and deposit shall be retained.

C. SALE TO EXISTING MORTGAGE. Delivery of the usual Warranty Deed conveying a marketable title, subject to mortgage to be deducted from the purchase price. Payment of the purchase money is to be made in cash or certified check less the amount owing upon an existing mortgage now on the premises, with accord thereof to date of consummation, held by _____ Dollars, upon which there is unpaid the sum of approximately _____ Dollars, with interest at _____ per cent, which mortgage requires payments of _____ on the ____ day of each and every month, which payments DO, DO NOT include prepaid taxes and insurance. If the Seller has any accumulated funds held in escrow for the payment for any prepaid items, the Purchaser agrees to reimburse the Seller upon proper assignment of same. The Purchaser agrees to assume and pay said mortgage according to the terms thereof.

D. SALE ON LAND CONTRACT. Payment of the sum of _____ Dollars in cash or certified check, and the execution of a Land Contract acknowledging payment of that sum and calling for the payment of the remainder of the purchase money within ____ years from the date of Contract in monthly payments of not less than _____ Dollars each commencing _____, which include interest payments at the rate of ____ per cent per annum, which DO, DO NOT include prepaid taxes and insurance.

If the Seller's title to said land is evidenced by an existing land contract with experienced terms and conditions substantially as above set forth and the cash payment to be made by the undersigned on consummation hereof will pay out the equity, an assignment and conveyance of the vendor's interest in the land contract, with an agreement by the undersigned to assume the balance owing thereof, will be accepted of the contract proposed in the preceding paragraph. If the Seller has any accumulated funds held in escrow for the payment of prepaid taxes or insurance, the Purchaser agrees to reimburse the Seller upon the proper assignment of same.

2. The Seller shall deliver and the Purchaser shall accept possession of said property, subject to the rights of the following tenants: N/A _____. If the Seller occupies the property it shall be vacated on or before N/A _____ days after closing. From the date of closing to the date of vacation the property as Agreed, SELLER SHALL PAY the term of $ ZERO _____ per day. THE BROKER SHALL RETAIN from the amount due Seller at closing the sum of $ ZERO _____ as security for said occupancy charge, paying to the Purchaser the amount due him and returning to the Seller the unused portion as determined by this property is vacated and kept according to Broker.

3. The Broker is hereby authorized to make this offer and the deposit of $ 2,000 _____ Dollars in form of cash, check, note, shall be held by him under P.A. 280 of 1980, as amended, and applied on the purchase price if the sale is consummated.

4. APPLICABLE TO V.A. OR F.H.A. SALES ONLY: It is expressly agreed that, notwithstanding any other provision of this contract, the Purchaser shall not be obligated to complete the purchase of the property described herein or to incur any penalty by forfeiture of earnest money deposits or otherwise unless the Seller has delivered to the Purchaser a written statement issued by the Veterans Administration or Federal Housing Commissioner setting forth the appraised value of the property for mortgage insurance purposes of not less than $ _____, which statement the Seller hereby agrees to deliver to the Purchaser promptly after such appraised value statement is made available to the Seller. The Purchaser shall, however, have the privilege and option of proceeding with the consummation of this contract without regard to the amount of the appraised valuation made by the Veterans Administration or Federal Housing Commission. It is further understood between Purchaser and Seller that the additional personal property listed herein has a value of $ _____

Purchasers Initials _____                    Sellers Initials _____

1

# GENERAL CONDITIONS

5. As evidence of title, Seller agrees to furnish Purchaser as soon as possible, a commitment for Title Insurance in an amount not less than the purchase price, bearing date later than the acceptance hereof and guaranteeing the title in the condition required for performance of this order, or a complete abstract of title and tax history certified to a date later than the acceptance hereof.

6. If this offer is accepted by the Seller and if title can be conveyed in the condition required hereunder, the Purchaser agrees to complete the sale within 10 days after delivery of the abstract of Commitment of title insurance; however, if the sale is to be consummated in accordance with paragraph 8, then closing will be governed by the time there specified for obtaining a mortgage in the event of default by the Purchaser hereunder, the Seller may, at his option, elect to enforce the terms hereof or declare a forfeiture hereunder and retain the deposit as liquidated damages.

7. In the event of default by the Seller hereunder, the Purchaser may, at his option, elect to enforce the terms hereof or demand, and be entitled to, an immediate refund of his entire deposit in full termination of this agreement.

8. If objection to the title is made, based upon a written opinion of Purchaser's attorney that the title is not in the condition required for performance hereunder, the Seller shall have 30 days from the date he is notified in writing of the particular defects claimed, either (1) to remedy the title, or (2) to obtain title insurance as required above, or (3) to refund deposit in full termination of this agreement if unable to remedy the title or obtain title insurance. If the Seller remedies the title or shall obtain such title policy within the time specified, the Purchaser agrees to complete the sale within 10 days of written notification thereof. If the Seller is unable to remedy the title or obtain title insurance within the time specified the deposit shall be refunded forthwith in full termination of this agreement.

9. All taxes and assessments which have become a lien upon the land and are due and payable whether recorded or not recorded, at the date of this agreement shall be paid by the Seller. Current taxes, if any, shall be prorated and adjusted as of the date of closing in accordance with DUE date basis of the municipality or taxing unit in which the property is located. For purposes of this agreement all real property taxes are to be considered paid in advance. Interest, rents and water bill shall be prorated and adjusted as of the date of closing.

10. In consideration of the Broker's effort to obtain the Seller's approval, it is understood that this offer is irrevocable for FIVE days from the date hereof and if not accepted by the Seller within that time, the deposit shall be returned forthwith to the Purchaser. If the offer is accepted by the Seller, the Purchaser agrees to complete the purchase of said property within the time indicated i paragraph 6.

11. Any closing fees charged for services rendered by a bank, title company or escrow company shall be paid by the purchaser except where the payment of same shall be prohibited by law, in which case such fee shall be paid by the seller.

12. The Purchaser and Seller acknowledge and agree that the broker may act as their agent in obtaining mortgage financing, casualty insurance, title insurance or such other items that are necessary to consummate the sale.

13. By the execution of this instrument the Purchaser acknowledges, THAT HE HAS EXAMINED THE ABOVE described premises and is satisfied with the Physical condition of structure thereon and purchases said property in an "as is condition," also acknowledges the receipt of a copy of this offer. It is further understood and agreed that THE BROKER, does not warrant the condition of the property, nor assumes any responsibility for the representation made by the seller pertaining to the condition of the property. It is further understood that no promises have been made other than those that are in writing and signed by all parties involved (no verbal agreements will be binding.)

14. MORTGAGE CREDIT. All purchase agreements originated as of 9/15/76 must indicate that the responsibility of repairs is the seller's at the time of firm application. If this information is lacking, HUD-FHA will no longer assume that this is the seller's responsibility, and will reject the application.

15. The covenants and conditions herein shall bind and inure to the benefits of the executors, administrators, successors and assigns of the respective parties. If the parties herein be more that one or if they be of the feminine sex, or a corporation or other business entity, such words and pronouns and other relative words shall be read as if written in the plural, feminine and neuter, respectively.

16. We hereby acknowledge that this offer constitutes the entire agreement between the parties.

ADDITIONAL CONDITIONS (If Any):

Seller agrees to a one (1) year maintenance warranty on said property. This shall cover any general maintenance not covered by the homeowner's insurance.

Seller agrees to guarantee tenancy for twelve (12) months. If property is unoccupied for the term noted, Seller will cover gross rents as outlined in 'Property Tracker Performance Protection' minus taxes.

Purchasers Initials ________ ________ Sellers Initials ________ ________

**PURCHASER:**

IN PRESENCE OF:

X______________________________ L.S.
LRB's Direct, LLC

X Lawrence R. Brooks, Managing Member ______________ L.S.

Dated______________________

Address 1627 HalBrook Drive
San Jose, CA 95124
______________________

Phone ( 408 ) 599-4755 / 408-979-9000

**BROKER'S ACKNOWLEDGEMENT OF DEPOSIT**

Received from the above named Purchaser the deposit money above mentioned, which will be applied as indicated in paragraph's 3 and 10, or will be returned forthwith after tender if the foregoing offer and deposit is declined.

______________________ Broker By______________________

This is a co-operative sale on a ________ basis with ______________________

**ACCEPTANCE - TO THE ABOVE NAMED PURCHASER AND BROKER:** The foregoing offer is accepted in accordance with the terms stated, and upon consummation Seller hereby agrees to pay the Broker for services rendered a commission of (______________________) Dollars (__________ per cent of the sale price), which shall be due and payable at the time set in said offer for the consummation of the sale, or if unconsummated, at the time of the Seller's election to refund the deposit, or of Seller's of Purchaser's failure, inability or refusal to perform the conditions of this offer, provided, however, that if the deposit is forfeited under the terms of said offer, the Seller agrees that one-half of such deposit (but not in excess of the amount of the full commission) shall be paid to or be retained by the Broker in full payment for services rendered.

By the execution of this instrument, the Seller acknowledges the receipt of a copy of this agreement.

**SELLER:**

IN PRESENCE OF:

X______________________________ L.S.
Bay Area Equity Group, LLC

______________________

X______________________________ L.S.

Dated______________________

Address 1901 South Bascom Avenue
Suite 1325
Campbell, CA 95008
Phone ( 408 ) 369-9244

The undersigned Purchaser hereby acknowledges the receipt of the Seller's signed acceptance of the foregoing Offer to Purchase.

Dated______________________

X______________________________ L.S.
LRB's Direct, LLC Purchaser
Lawrence R. Brooks

NOTICE: IT IS RECOMMENDED THAT YOU SEEK THE ASSISTANCE OF A LAWYER OR OTHER QUALIFIED PERSON.

# EXHIBIT H

585 33

# OFFER TO PURCHASE REAL ESTATE

1. THE UNDERSIGNED hereby offers and agrees to purchase the following land situated in the City _____ of Detroit Wayne _____ County, Michigan, described as follows: 22773 North Kane Street, Detroit, MI 48223

being commonly known as 22773 North Kane Street, Detroit, MI 48223 _____ (Street), together with all improvements and appurtenances, including all lighting fixtures, window treatments, storm windows and storm doors, screens, awnings, TV antenna, _____ if any, now on the premises, and to pay therefore the sum of _____ $39,495 _____ Dollars, subject to the existing building and use restrictions, easements and zoning ordinances, if any, upon the following condition:

**THE SALE TO BE CONSUMMATED BY:** (Fill in one of the four following paragraphs, and strike out the remainder.)

**A.** CASH SALE. Delivery of the usual Warranty Deed conveying a marketable title. Payment of purchase money is to be made in cash or certified check.

**B.** CASH SALE WITH NEW MORTGAGE. Delivery of the usual Warranty Deed conveying a marketable title. Payment of purchase money is to be made in cash or certified check. This agreement is contingent upon the purchaser being able to secure a _____ mortgage in the amount of $ _____ for a term of _____ years and pay it _____ down plus mortgage costs, prepaid items, and adjustments in cash. Purchaser agrees to apply for such mortgage within _____ days from acceptance of this offer at his own expense. If a commitment for such mortgage cannot be obtained within _____ days from date of acceptance, at the Seller's option, this offer can be declared null and void and deposit shall be returned.

**C.** SALE TO EXISTING MORTGAGE. Delivery of the usual Warranty Deed conveying a marketable title, subject to mortgage to be deducted from the purchase price. Payment of the purchase money is to be made in cash or certified check less the amount owing upon an existing mortgage now on the premises, with accrued interest to date of consummation, held by _____ _____ upon which there is unpaid the sum of approximately _____ Dollars, with interest at _____ per cent, which mortgage requires payments of _____ Dollars on the _____ day of each and every month, which payments DO, DO NOT include prepaid taxes and insurance. If the Seller has any accumulated funds held in escrow for the payment for any prepaid items, the Purchaser agrees to reimburse the Seller upon proper assignment of same. The Purchaser agrees to assume and pay said mortgage according to the terms thereof.

**D.** SALE ON LAND CONTRACT. Payment of the sum of $ _____ Dollars in cash or certified check, and the execution of a Land Contract acknowledging payment of first sum and calling for the payment of the remainder of the purchase money within _____ years from the date of Contract in monthly payments of not less than $ _____ Dollars each commencing _____ which include interest payments at the rate of _____ per cent per annum, which DO, DO NOT include prepaid taxes and insurance.

If the Seller's title is not land is evidenced by an existing land contract with unperformed terms and conditions substantially as above set forth and the cash payment to be made by the undersigned on consummation hereof will pay out the equity, an assignment and conveyance of the vendor's interest in the land contract, with an agreement by the undersigned to assume the balance owing thereof, will be accepted of the contract proposed in the preceding paragraph. If the Seller has any accumulated funds held in escrow for the payment of prepaid taxes or insurance, the Purchaser agrees to reimburse the Seller upon the proper assignment of same.

2. The Seller shall deliver and the Purchaser shall accept possession of said property, subject to the rights of the following tenants: N/A _____ If the Seller occupies the property it shall be vacated on or before N/A _____ days after closing. From the date of closing to the date of vacation the property as Agreed, SELLER SHALL PAY the sum of $ ZERO _____ per day. THE BROKER SHALL RETAIN from the amount due Seller at closing the sum of $ ZERO _____ as security for said occupancy charge, paying to the Purchaser the amount due him and returning to the Seller the unused portion as determined by date property is vacated and keys surrendered to Broker.

3. The Broker is hereby authorized to make this offer and the deposit of $ zero _____ Dollars in form of cash, check, note, shall be held by him under P.A. 299 of 1960, as amended, and applied on the purchase price if the sale is consummated.

4. APPLICABLE TO V.A. OR F.H.A. SALES ONLY: It is expressly agreed that, notwithstanding any other provisions of this contract, the Purchaser shall not be obligated to complete the purchase of the property described herein or to incur any penalty by forfeiture of earnest money deposits or otherwise unless the Seller has delivered to the Purchaser a written statement issued by the Veterans Administration or Federal Housing Commissioner setting forth the appraised value of the property for mortgage insurance purposes of not less than $ _____ which statement the Seller hereby agrees to deliver to the Purchaser promptly after such appraised value statement is made available to the Seller. The Purchaser shall, however, have the privilege and option of proceeding with the consummation of this contract without regard to the amount of the appraised valuation made by the Veterans Administration or Federal Housing Commissioner. It is further understood between Purchaser and Seller that the additional personal property listed herein has a value of $ _____

Purchasers Initials _____        Sellers Initials _____

1

# GENERAL CONDITIONS

**5.** As evidence of title, Seller agrees to furnish Purchaser as soon as possible, a commitment for Title Insurance in an amount not less than the purchase price, bearing date later than the acceptance hereof and guaranteeing the title in the condition required for performance of this order; or a complete abstract of title and tax history certified to a date later than the acceptance hereof.

**6.** If this offer is accepted by the Seller and if title can be conveyed in the condition required hereunder, the Purchaser agrees to complete the sale within 10 days after delivery of the abstract of Commitment of Title Insurance; however, if the sale is to be consummated in accordance with paragraph 8, then closing will be governed by the time there specified for obtaining a mortgage in the event of default by the Purchaser hereunder, the Seller may, at his option, elect to enforce the terms hereof or declare a forfeiture hereunder and retain the deposit as liquidated damages.

**7.** In the event of default by the Seller hereunder, the Purchaser may, at his option, elect I enforce the terms hereof or demand, and be entitled to, an immediate refund of his entire deposit in full termination of this agreement.

**8.** If objection to the title is made, based upon a written opinion of Purchaser's attorney that the title is not in the condition required for performance hereunder, the Seller shall have 30 days from the date he is notified in writing of the particular defects claimed, either (1) to remedy the title, of (2) to obtain title insurance as required above, or (3) to refund deposit in full termination of this agreement. If unable to remedy the title or obtain the insurance. If the Seller remedies the title or shall obtain such title policy within the time specified, the Purchaser agrees to complete the sale within 10 days of written notification thereof. If the Seller is unable to remedy the title or obtain title insurance within the time specified the deposit shall be refunded forthwith in full termination of this agreement.

**9.** All taxes and assessments which have become a lien upon the land and are due and payable whether recorded or not recorded, at the date of this agreement shall be paid by the Seller. Current taxes, if any, shall be prorated and adjusted as of the date of closing in accordance with DUE date basis of the municipality or taxing unit in which the property is located. For purposes of this agreement all real property taxes are to be considered paid in advance. Interest, rents and water bill shall be prorated and adjusted as of the date of closing.

**10.** In consideration of the Broker's effort to obtain the Seller's approval, it is understood that this offer is irrevocable for FIVE days from the date hereof and if not accepted by the Seller within that time, the deposit shall be returned forthwith to the Purchaser. If the offer is accepted by the Seller, the Purchaser agrees to complete the purchase of said property within the time indicated I paragraph 6.

**11.** Any closing fees charged for services rendered by a bank, title company or escrow company shall be paid by the purchaser except where the payment of same shall be prohibited by law, in which case such fee shall be paid by the seller.

**12.** The Purchaser and Seller acknowledge and agree that the broker may act on their agent in obtaining mortgage financing, casualty insurance, title insurance or such other items that are necessary to consummate the sale.

**13.** By the execution of this instrument the Purchaser acknowledges, THAT HE HAS EXAMINED THE ABOVE described premises and is satisfied with the Physical condition of structure therein and purchases said property in an "as is condition," also acknowledges the receipt of a copy of this offer. It is further understood and agreed that THE BROKER, does not warrant the condition of the property, nor assume any responsibility for the representations made by the seller pertaining to the condition of the property. It is further understood that no promises have been made other than those that are in writing and signed by all parties involved (no verbal agreements will be binding.)

**14.** MORTGAGE CREDIT. All purchase agreements originated as of 8/15/06 must indicate that the responsibility of repairs is the seller's at the time of firm application. If this information is lacking, HUD-FHA will no longer assume that this is the seller's responsibility, and will reject the application.

**15.** The covenants and conditions herein shall bind and inure to the benefits of the executors, administrators, successors and assigns of the respective parties. If the parties hereto be more that one or if they be of the feminine sex, or a corporation or other business entity, such words and pronouns and other relative words shall be read as if written in the plural, feminine and neuter, respectively.

**16.** We hereby acknowledge that this offer constitutes the entire agreement between the parties.

ADDITIONAL CONDITIONS (if any):
Seller agrees to a one (1) year maintenance warranty on said property. This shall cover any general maintenance not covered by the homeowner's insurance.

Seller agrees to guarantee tenancy for twelve (12) months. If property is unoccupied for the term noted, Seller will cover gross rents as outlined in 'Property Tracker Performance Projection' minus taxes.

Purchasers Initials ____ ____                                    Sellers Initials ____ ____

2

_____

**PURCHASER:**

IN PRESENCE OF:

X_____ L.S.
    LRB's Direct, LLC

X_____ L.S.
    Lawrence R. Brooks, Managing Member

Dated_____

Address_____

    1227 Hallbrook Drive

    San Jose, CA 95124

    Phone  (    408    )  599-4755 / 408-978-0000

**BROKER'S ACKNOWLEDGEMENT OF DEPOSIT**

Received from the above named Purchaser the deposit money above mentioned, which will be applied as indicated in paragraphs 9 and 10, or will be returned forthwith after tender if the foregoing offer and deposit is declined.

_____ Broker    By_____

This is a co-operative sale on a_____ basis with_____

**ACCEPTANCE - TO THE ABOVE NAMED PURCHASER AND BROKER:** The foregoing offer is accepted in accordance with the terms stated, and upon consummation Seller hereby agrees to pay the Broker for services rendered a commission of (_____)
Dollars (_____ per cent of the sale price), which shall be due and payable at the time and in said offer for the consummation of the sale, or if unconsummated, at the time of the Seller's election to refund the deposit, or of Seller's or Purchaser's failure, inability or refusal to perform the conditions of this offer provided, however, that if the deposit is forfeited under the terms of said offer, the Seller agrees that one-half of such deposit (but not in excess of the amount of the full commission) shall be paid to or be retained by the Broker in full payment for services rendered.

By the execution of this instrument, the Seller acknowledges the receipt of a copy of this agreement.

**SELLER:**

IN PRESENCE OF:

X_____ L.S.
    Bay Area Equity Group, LLC

X_____ L.S.

Dated_____

Address 1901 South Bascom Avenue

    Suite 1235

    Campbell, CA 95008

    Phone  (    408    )  399-8244

The undersigned Purchaser hereby acknowledges the receipt of the Seller's signed acceptance of the foregoing Offer to Purchase.

Dated_____    X_____ L.S.
                                   LRB's Direct, LLC                    Purchaser
                                   Lawrence R. Brooks

**NOTICE:  IT IS RECOMMENDED THAT YOU SEEK THE ASSISTANCE OF A LAWYER OR OTHER QUALIFIED PERSON.**

3